**UNITED STATES v. CAROLENE PRODUCTS CO. et al.**

**Indictment No. A-5216.**

District Court, N. D. West Virginia.
Sept. 7, 1943.

Joe V. Gibson, U. S. Atty., of Kingwood, W. Va., and Ezra E. Hamstead, Asst. U. S. Atty., of Clarksburg, W. Va., and Mark C. Reno, Atty., Department of Justice, and John A. Murphy, Atty., Food & Drug Administration, both of Washington, D. C., for the United States.

Handlan, Garden & Matthews, Howard D. Matthews, G. Alan Garden, and Lester C. Hess, all of Wheeling, W. Va., and Kaufman & Cronan, Samuel H. Kaufman, and Edward Rohr, all of New York City, for defendants.

BAKER, District Judge.

The defendants, Carolene Products Company, a corporation, and Charles Hauser and William H. Hartke, individuals, were indicted at the October Term, 1942, at Wheeling, W.Va., for a violation of what is commonly known as the "Filled Milk Act of 1923, § 1." 21 U.S.C.A. § 61.

The Carolene Products Company is a Michigan corporation, whose sole business is the sale of three products, known respectively as "Milnot," "Milnut," and "Carolene." Milnut was, briefly, a product resulting from the mixture of coconut oil, skimmed milk, and fish oils. Milnot was the same product except that cottonseed oil was substituted for coconut oil. Both of these products are sold under the name of "Carolene." Since, for the purpose of this case, the distinction between the three products is entirely immaterial, I will refer to the company's product as "Carolene" throughout this opinion.

Carolene is manufactured by the Litchfield Creamery Company, a corporation, operating creameries in Litchfield, Illinois, and Warsaw, Indiana. Throughout this opinion all dates, when material, will be as of the year 1941, unless specifically stated otherwise.

The defendant Charles Hauser was President of the Carolene Products Company; was one of the original incorporators thereof, and a director of that company. The defendant William H. Hartke was President of the Litchfield Creamery Company and Vice-President of the Carolene Products Company. The main offices of the Carolene Products Company were maintained at the Litchfield Creamery Company's Litchfield plant and the same rooms in that plant served for offices of both the Carolene Products Company and the Litchfield Creamery Company. Charles Hauser's office was in the Litchfield Creamery Company's plant, from which office he carried on his duties in relation to both companies. This same office was used by Hartke to transact his business in connection with the two companies. In short, the Carolene Products Company was a corporation,

which marketed one of the products of the Litchfield Creamery Company.

The indictment in this case, as noted above, is brought under Title 21 U.S.C.A. Sections 61, 62, and 63, which read as follows:

"Section 61. Filled milk; definitions. Whenever used in sections 62 and 63 of this title—

"(a) The term 'person' includes an individual, partnership, corporation, or association;

"(b) The term 'interstate or foreign commerce' means commerce (1) between any State, Territory, or possession, or the District of Columbia, and any place outside thereof; (2) between points within the same State, Territory, or possession, or within the District of Columbia, but through any place outside thereof; or (3) within any Territory or possession, or within the District of Columbia; and

"(c) The term 'filled milk' means any milk, cream, or skimmed milk, whether or not condensed, evaporated, concentrated, powdered, dried, or desiccated, to which has been added, or which has been blended or compounded with, any fat or oil other than milk fat, so that the resulting product is in imitation or semblance of milk, cream, or skimmed milk, whether or not condensed, evaporated, concentrated, powdered, dried, or desiccated. This definition shall not include any distinctive proprietary food compound not readily mistaken in taste for milk or cream or for evaporated, condensed, or powdered milk, or cream where such compound (1) is prepared and designed for feeding infants and young children and customarily used on the order of a physician; (2) is packed in individual cans containing not more than sixteen and one-half ounces and bearing a label in bold type that the content is to be used only for said purpose; (3) is shipped in interstate or foreign commerce exclusively to physicians, wholesale and retail druggists, orphan asylums, child-welfare associations, hospitals, and similar institutions and generally disposed of by them.

"§ 62. Same; manufacture, shipment, or delivery for shipment in interstate or foreign commerce prohibited. It is declared that filled milk, as herein defined, is an adulterated article of food, injurious to the public health, and its sale constitutes a fraud upon the public. It shall be unlawful for any person to manufacture within any Territory or possession, or within the District of Columbia, or to ship or deliver for shipment in interstate or foreign commerce, any filled milk.

"§ 63. Same; penalty for violations of law; acts, omissions, and so forth, of agents. Any person violating any provision of sections 61 and 62 of this title shall upon conviction thereof be subject to a fine of not more than $1,000 or imprisonment of not more than one year, or both. When construing and enforcing the provisions of said sections, the act, omission, or failure of any person acting for or employed by any individual, partnership, corporation, or association, within the scope of his employment or office, shall in every case be deemed the act, omission, or failure, of such individual, partnership, corporation, or association, as well as of such person."

The indictment is in eight counts, charging eight separate shipments of filled milk from Warsaw, Indiana, to Clarksburg, Parkersburg, Weston, Morgantown, and Moundsville, in the Northern District of West Virginia. All these shipments were made between February and July of the year 1941, and totalled 5,800 cases, of 48 cans to the case.

Many of the pertinent facts were stipulated upon the trial of this case. Such proof as the Government did introduce was not denied by the defendants. Therefore, there is really no dispute as to the facts involved. They are briefly as follow:

The Litchfield Creamery Company would bring into its Warsaw, Indiana, plant, whole milk procured from the farmers in that vicinity. The cream was then separated from this milk. To the skimmed milk thus obtained was added a sufficient quantity of cottonseed oil to replace the butter fat extracted with the cream. There was also added a small quantity of high potency fish-liver oil to introduce vitamins A and D into the product. The entire product was then evaporated to the consistency of that ordinarily found in condensed whole milk. It was then homogenized; that is, it was forced under great pressure through small openings, resulting in the breaking up of the fat globules in the cottonseed oil and distributing the same evenly through the entire body of the resulting mixture, thus insuring that when this product was canned the oil would not rise to the top but would remain suspended through the entire volume of milk. Upon the completion of the evaporation and homogenization, the prod-

uct was placed in cans, the cans labeled and packed in cases. The cases, in turn, were placed in the warehouse at Warsaw. Thompson, the manager of the Warsaw plant, was originally employed by Hauser. He received his orders as to bills of lading from Hartke and Hauser.

The Company had salesmen calling upon the various wholesale grocers in the country and soliciting and taking orders for "Carolene." These orders were sent into the main office at Litchfield, and the Litchfield Office would then contact the plant at Warsaw, usually by telephone, sometimes by written order, and instruct the Manager of the Warsaw plant to ship a designated number of cases of Carolene to a given purchaser. These cases were shipped by railway freight, the Carolene Products Company being designated as consignor. Payment for the goods was made to the office at Litchfield, checks being banked with a rubber-stamp endorsement of the Carolene Products Company.

This same business was being carried out at the Litchfield plant; however, in this particular case, all shipments were actually made from Warsaw.

In the year 1941, the Warsaw plant sold 440,000 cases, and the Litchfield plant, 1,150,000 cases, of Carolene. Approximately half of this total output was shipped in interstate commerce.

The product "Carolene" looked, tasted, and smelled like condensed whole milk and was of practically the same texture and consistency. It was packed in cans of the same size and shape customarily employed by packers of condensed, whole milk.

When the indictment was returned, a demurrer and a plea in abatement were filed thereto by each of the defendants. The Government demurred to the plea in abatement. Both the demurrer and plea in abatement raised the same defense, that was, briefly, that the filled milk act does not apply to Carolene, or, if it does so apply, that as to Carolene the said act is unconstitutional. The demurrer to the indictment was overruled, and the demurrer to the plea in abatement was sustained. Since the questions presented, however, really constituted the only defense by the corporation, I feel my ruling thereon should be briefly reviewed at this time.

The contention of the defendants was that the product "Carolene" was a wholesome, nutritive article of food; that their labels properly branded the article; and that no fraud was perpetrated upon the public by its sale. For this reason they maintained that the filled milk act did not apply to this product. There is no contention by the Government that the defendants' labels violate any Act of Congress or regulation passed thereunder, and the labeling question is completely outside of this case. The other part of the defense, namely, that the product is wholesome and nutritive, was argued at great length and with much ability by counsel for the defendants, both in their oral presentation and in their briefs filed with the Court. That argument boils down to about this contention, that about the time the filled milk act was passed, the commercial fortification of food products by the addition of vitamins not naturally present was not known to science. They contend that in 1923 medical science knew very little about vitamins. They further contend that the Congress' purpose in passing the filled milk act in 1923 was to keep the public from using as food a milk product from which the essential vitamins had been removed, and that now, in the light of present knowledge, it is possible to replace these vitamins by the addition of fish oil, and that, therefore, their product "Carolene" is not such a product as was intended by Congress to be prohibited; or that if the Court holds that it is such a product, that then the Act is unconstitutional.

Fortunately for the Court this Statute has been construed in regard to the very product here involved. In the case of United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234, the Court held that the Act was, on its face, constitutional. In a later case, Carolene Products Co. v. Wallace, 27 F.Supp. 110, 112, the District Court for the District of Columbia had before it the construction of this Statute as applying to this identical product; that is, "Carolene," to which high potency fish oil had been added. In that case the Court, in its discussion, used the following pertinent language: "The issue which plaintiff presents draws in question the legislative judgment and we think the Congressional hearings and reports in evidence, clearly reveal a state of facts which furnishes ample support for the legislative action of which plaintiff complains. Upon the considerations placed before the committees and the Congress, it became a legislative function to regulate, restrict or pro-

hibit articles of food, though wholesome and nutritious in the exercise of its commerce power. Legislative acts, when subjected to judicial scrutiny, must be presumed to rest on a rational basis if such would exist under any conceivable state of facts; and if a practical question be addressed to the law making department it will require a plain case of departure from every public purpose which could reasonably be conceived to justify the intervention of a court: when public evils ensue from individual misfortune or need, the legislature may strike at the evil at its source. If the purpose is legitimate because public, it will not be defeated. Carmichael v. Southern Coal Co., 301 U. S. 495, 518, 57 S.Ct. 868, 81 L.Ed. 1245, 109 A.L.R. 1327."

And further on in the opinion:

"It does not follow that because a transaction separately considered is innocuous it may not be included in a prohibition the scope of which is regarded as essential in the legislative judgment to accomplish a purpose within the admitted power of the Government. Unless it clearly appears that the enactment has no substantial relation to a proper purpose, it cannot be said that the limit of legislative power has been transcended. Judicial opinion of expediency may not be substituted for the will of the legislature. Purity Extract [& Tonic] Co. v. Lynch, 226 U.S. 192, 33 S.Ct. 44, 57 L.Ed. 184. The case is authority for the proposition that since the opinion is extensively held that a general prohibition of sale of malt liquors whether intoxicating or not is necessary to suppress the sale of intoxicants, in the exercise of its police power a state may include within the prohibition innocent malt beverages.

"The reports of the Congressional committees reveal the considerations placed before the Congress. The report of the House committee indicates that it was found and believed that filled milk had taken the place of thousands of pounds of butter fat, injuring the market of the American farmer, bringing his product into competition with an inferior product produced by oriental and other cheap labor and handled in many instances under shockingly insanitary conditions. These committees reported to Congress that filled milk lends itself to fraudulent marketing practices. Indeed the Senate committee reported that it was of opinion that it is impossible to prevent fraudulent use and sale of the compound on account of the incentive of additional profit. The reports further represented to Congress that filled milk was an inferior product. They made reference to 'Carolene' by specific mention and found that it and other filled milk products were lacking in certain vitamins which are absolutely necessary to promote growth in the human hody. Whether as plaintiff contends it has overcome this condition of inferiority by adding to its products cod liver oil supplying in the 'New Vitamin A Carolene' and the 'New Vitamin A Milnut' the vitamins found to be lacking in the earlier product, need not be determined since we find that other considerations before the Congressional committees were of sufficient public concern to justify the exclusion of filled milk, as defined by Congress, from movement in interstate commerce."

The opinion is well summed up by Point 1 of the Syllabus, reading as follows: "Where statute prohibited the shipment in interstate commerce of skimmed milk compounded with any fat or oil other than milk fat so as to resemble milk or cream, the wholesome and nutritious qualities of a product does not exclude it from the regulated class."

An appeal from this opinion was taken to the Supreme Court of the United States, which granted a motion to affirm, 307 U.S. 612, 59 S.Ct. 1033, 83 L.Ed. 1495.

It is true that in the United States v. Carolene case, 304 U.S. 144, 145, 58 S.Ct. 778, 82 L.Ed. 1234, Mr. Justice Butler wrote a brief opinion concurring in the result of that decision, but indicating that he felt that the question of the wholesome and nutritive character of the product could properly be introduced as a defense to a prosecution under the filled milk act. Mr. Justice Butler must have felt that the majority opinion of the Court was deciding that such questions could not be raised as a defense, else there would have been no occasion for filing a separate though concurring opinion. The District Court for the District of Columbia obviously took the other view and was affirmed by the latter decision of the Supreme Court. For this reason I was constrained to hold that the defense of wholesomeness and high nutritive qualities was not available in a prosecution under this Statute.

The defendants waived a jury and the case was tried by the Court.

One defense urged in the brief for the defendants is that there was no proof on the trial that Carolene "is in imitation or semblance of milk, cream or skimmed milk whether or not condensed, etc." It was stipulated that if called as witnesses, the Government Chemists Bornmann and Kunke would testify that they had analyzed and examined samples taken from each shipment charged in the indictment, and that each were virtually indistinguishable from evaporated milk in taste, color, odor, appearance, and consistency. There was no evidence to the contrary; in fact, counsel for the defendants, during a colloquy with the Court, stated that Carolene looked, tasted, smelled, and had the consistency of ordinary condensed milk. While statements of counsel may not be evidence in a case, the stipulated testimony of Bornmann and Kunke sustains, beyond a reasonable doubt, the finding that Carolene is in semblance of milk. In addition, there is the testimony of Thompson, the Manager of the Warsaw plant, that Carolene could not be distinguished by the eye from condensed milk.

It should be noted that the Statute uses the subjunctive and bars to interstate commerce the product if it "is in imitation or semblance of milk." Under this Statute it is not necessary to prove a conscious imitation so long as the product is in semblance of milk; that is, so long as it reacts to the human senses as milk would react. I, therefore, find that the evidence proves, beyond a reasonable doubt, Carolene to be in semblance of condensed milk.

With this finding and with the defense set up in the demurrer and plea in abatement overruled, the corporation must be held guilty, since the addition of fat, other than butter fat, to a skimmed milk product, and the interstate shipment thereof, has been admitted; at least, as to the corporation.

This brings us to the question of the guilt of the individual defendants, Charles Hauser and William H. Hartke. In the first place, it is admitted by the Government, at least in its brief, that there is no evidence to show that either of the individual defendants personally made or even had knowledge of the eight specific shipments complained of in this indictment. On the other hand, the evidence conclusively shows that the individual defendants were the active, directing heads of both the Carolene Products Company and its parent corporation, the Litchfield Creamery Company, and that as such directing heads they caused the Carolene Products Company to engage in an extensive shipment of Carolene in interstate commerce. In this connection, it should be borne in mind that the Carolene Products Company had only one business, which was the sale of Carolene. Half of this business consisted of sales which resulted in shipping the product in interstate commerce. Therefore, under my ruling, 50% of the company's business was illegal. We do not here have the case of a corporation engaged in a proper and legal enterprise with an occasional violation of Federal law resulting therefrom. We have a case in which 50% of the company's business resulted in violations of the Filled Milk Act. No one could read the record in this case and come to any conclusion other than that Mr. Hartke and Mr. Hauser knew that the company was shipping this product in interstate commerce practically every business day. We must also bear in mind that intent is not a necessary element of this offense.

The question of the criminal liability of corporate officers for the acts of a corporation has been before the Courts many times. A brief summary of some of the more important decisions might be enlightening.

In the case of United Cigar Whelan Stores Corporation et al. v. United States, 9 Cir., 113 F.2d 340, a manager of a cigar store was held properly convicted of illegal sales of denatured alcohol by store clerks, even though he was not actually present in the store at the time the sales were made. In commenting upon this feature of the case, the Court said, at page 346 of 113 F.2d: "Neither does any reason present itself why Dehne was not properly found guilty of all sales, rather than those only in which he physically participated. Dehne was manager of the store, in a position of responsibility, the others were merely clerks; the business was carried on under his direction, as agent for the corporate defendant. 'It is not necessary that an aider or abettor be present at the actual commission of the offense or know details thereof. Collins v. United States, 8 Cir., 20 F.2d 574, 578; Parisi v. United States, 2 Cir., 279 F. 253, 255.' Borgia v. United States, supra [9 Cir., 78 F.2d 550] at page 555."

In the case of Wood et al. v. United States, 204 F. 55, our own Circuit Court of

Appeals for the Fourth Circuit held that an indictment for unlawfully carrying on the business of distillers with intent to defraud the United States, or having a still under their superintendence, is supported by proof that the distillery was owned by a corporation of which defendants were the officers and manager.

In the course of the opinion, Judge Rose, then on the District Court Bench, but sitting with Judges Goff and Pritchard on the Circuit Court of Appeals, said on page 58 of 204 F.: "A corporation can only act through human agencies. If the persons who actually direct and commit the frauds upon the government are not distillers or persons having superintendence of a still, as charged in the counts of the indictment under consideration, no one can ever be in those cases in which the distillery belongs to and is operated by a corporation. Speaking with precise technical accuracy, it may be said that what happened was that the corporation committed these offenses and that the defendants and each of them knowingly, willfully, and actively aided, abetted, and procured their commission."

The same general principle of law was announced by the Fourth Circuit Court of Appeals in the more recent case of Backun v. United States, 112 F.2d 635. In this case Backun was convicted of transporting stolen merchandise of value in excess of $5,000 in interstate commerce, knowing it to have been stolen. The evidence showed that Backun in New York sold certain stolen silverware to one Zucker, who took it with him on a trip through the South and resold it there. The conviction was reversed for failure of proof that the goods stolen did exceed the value of $5,000, but Judge Parker, in his opinion, clearly sets forth that one who makes a profit by furnishing to criminals, either by sale or otherwise, the means of carrying out their undertakings, becomes equally guilty in the transaction.

The criminal liability of corporate officers, for the acts of a corporation, has been frequently before the various State Courts. In People v. Detroit White Lead Works et al., 82 Mich. 471, 46 N.W. 735, at page 737, 9 L.R.A. 722, the Court said: "The officers of the company are jointly responsible for the business. It is not necessary to have conviction that they should have been actually engaged in work upon the premises. The work is carried on by employees. The directors and officers are the persons primarily responsible, and therefore the proper ones to be prosecuted."

In the case of Crall et al. v. Commonwealth, 103 Va. 855, 49 S.E. 638, a corporation and its Vice President were charged with peddling goods without a license. The defendants contended that the corporate officer could not be convicted since he did not actually make any sales. The Court said (49 S.E. at page 640): "This statement of the law is too narrow, and, if followed, would in many instances afford immunity to the chief offenders, the officers of the corporation, without whose assistance it would be impossible for the corporation to engage in the prohibited business. A corporation can act alone through its officers and agents, and where the business itself involves a violation of the law the correct rule is that all who participate in it are liable."

Title 18 U.S.C.A. Section 550, "Whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal," makes all aiders and abettors of a crime principals therein. Under this Section an accessory, either at or before the fact, may, at the pleader's option, be charged directly with the commission of the crime, and be convicted by proof that he aided and abetted its commission. Greenberg v. United States, 8 Cir., 297 F. 45; Wood v. United States, 4 Cir., 204 F. 55, etc.; 31 Corpus Juris 740.

The individual defendants say that they should be acquitted because there is no evidence that they made the shipments of "Carolene," or that they had personal knowledge that the precise shipments, alleged in the indictment, into the Northern District of West Virginia, were to be made or were, in fact, made. As noted above, Hauser was President of Carolene Products Company, and Hartke was Vice President. Both were directors and both maintained their offices in one of the plants in which "Carolene" was manufactured. A corporation can act only through agents. Speaking with precise technical accuracy, it may be said that what happened in each instance alleged in the indictment was that the corporation, Carolene Products Company, committed the specific offense, and that the defendants, Charles Hauser, President, and William H. Hartke, Vice President, willfully and actively aided and abet-

ted the corporation in this regard. There is an abundance of evidence in the record to convince me, beyond a reasonable doubt, that that was precisely what the two individual defendants did in this case; hence, since they are proven by the evidence to have been aiders and abettors, they must, under Title 18 U.S.C.A. Section 550, be held guilty as principals, and I now so hold them.

As noted above, intent is not a necessary element of this offense; yet, common sense leads us to a query as to just why there is a Carolene Products Company. Hauser and Hartke had the Litchfield Creamery Company. This company was engaged in the manufacture and sale of general dairy products, including evaporated whole milk. It also manufactured this one product, "Carolene," which it, for some reason, did not wish to sell under its own name, and for the sale of that one product organized a separate corporation. There must have been some reason for this else why the trouble and expense of maintaining two sets of books, two organizations, etc. Often corporations resort to a subsidiary to sell substandard goods. We all know that many of our large concerns sell defective products, "seconds," by this means. But here, the defendants contended in their plea, demurrer, and all through the trial, that "Carolene" is as good and wholesome as condensed milk. There may be a legitimate answer, not in the record, but only one occurs to me, and that is that Hauser and Hartke knew "Carolene" violated the filled milk act and organized the company to protect the Litchfield Creamery Company from a violation of the law.

It should be borne in mind, in this connection, that I am bound by the Act of Congress in this case. The defendants, in their proffer, made a strong case for the wholesomeness and nutritive value of their product. It is true that under my ruling excluding this evidence the Government had no opportunity to rebut it, nor even to cross-examine defendants' witnesses; nevertheless, I again agree with Judge Letts (see Carolene Products Co. v. Wallace, D.C., 27 F.Supp. 110), wherein he found, as a fact, that the plaintiff's products are wholesome. This defense, however, must be presented to Congress and not the Courts. As the Supreme Court of the United States recently said: "The government presses upon us strong arguments of policy against the statutory plan, but the entire force of these considerations is directed solely at what the government thinks Congress should have done rather than at what it did. It is said * * * and finally that conditions have changed since the Act was passed in 1863. But the trouble with these arguments is that they are addressed to the wrong forum. Conditions may have changed, but the statute has not." United States ex rel. Marcus v. Hess, 317 U.S. 537, especially 546, 63 S.Ct. 379, 385, 87 L.Ed. ——.