CAROLENE PRODUCTS CO. ET AL. *v.* UNITED STATES.

No. 21.   Argued October 16, 17, 1944.—Decided November 6, 1944.

*Mr. Samuel H. Kaufman,* with whom *Messrs. Crampton Harris* and *George Trosk* were on the brief, for petitioners.

*Mr. Chester T. Lane,* with whom *Solicitor General Fahy* and *Assistant Attorney General Tom C. Clark* were on the brief, for the United States.

MR. JUSTICE REED delivered the opinion of the Court.

The limited writ of certiorari in this case was granted to review petitioners' conviction, affirmed by the Circuit Court of Appeals, for a violation of the Filled Milk Act.[1] The Court was moved to allow the petition in order to examine the contentions that the accused articles of food cannot, under the due process clause of the Fifth Amendment to the Constitution, be banned from commerce when these compounds are nutritionally sufficient and not "in imitation or semblance" of milk or any milk product within the meaning of the statute and are not sold as milk or a milk product.

The contentions which are raised by petitioners to avoid their conviction were not dealt with in our prior decision which upheld the act's validity upon demurrer to an earlier indictment which charged its violation. *United States* v. *Carolene Products Co.,* 304 U. S. 144.[2] Since these is-

---

[1] Act of March 4, 1923, 42 Stat. 1486; *United States* v. *Carolene Products Co.,* 51 F. Supp. 675; *Carolene Products Co.* v. *United States,* 140 F. 2d 61; *Carolene Products Co.* v. *United States,* 321 U. S. 760.

[2] Cf. *Carolene Products Co.* v. *Evaporated Milk Association,* 93 F. 2d 202. In *Carolene Products Co.* v. *Wallace,* 307 U. S. 612, 308 U. S. 506, here on appeal, we affirmed the refusal of the trial

sues are important to those affected by the act, certiorari was granted. 321 U. S. 760. Questions of due process under the Fourteenth Amendment, similar to those presented here, had arisen from state filled-milk legislation with varying results.[3] Consideration by this Court of the filled-milk legislation of Kansas appears in *Sage Stores Co.* v. *Kansas, post,* p. 32.

The facts, which are undisputed, are fully set out in the opinions of the District Court and the Circuit Court of Appeals. It is sufficient for our purposes to summarize them as follows. The corporate petitioner sells the products mentioned in the indictment which are manufactured for it by another corporation from skim milk, that is, milk from which a large percentage of the butterfat has been removed. The process of manufacture consists of taking natural whole milk, extracting the butterfat content and then adding cottonseed or cocoanut oil and fish liver oil, which latter oil contains vitamins A and D. The process includes pasteurization of the milk, evaporation, homogenization of the mixture and sterilization. The compound is sold under various trade names in cans of the same size and shape as those used for evaporated milk.

---

court to grant an interlocutory or final decree which would enjoin prosecution of the corporate petitioner for alleged violation of the Filled Milk Act. The affirmance was based on a lack of necessity for equitable intervention to protect the Carolene Products Co. from criminal prosecution.

[3] Cases which sustained the validity of state acts against attacks which were based on the due process clause of the Fourteenth Amendment were: *Carolene Products Co.* v. *Harter*, 329 Pa. 49, 197 A. 627; *Carolene Products Co.* v. *Mohler*, 152 Kans. 2, 13, 102 P. 2d 1044; *Carolene Products Co.* v. *Hanrahan*, 291 Ky. 417, 421, 164 S. W. 2d 597; *State* v. *Sage Stores Co.*, 157 Kans. 404, 412, 413, par. 5, 143 P. 2d 652.

*Contra: People* v. *Carolene Products Co.*, 345 Ill. 166, 177 N. E. 698; *Carolene Products Co.* v. *Thomson*, 276 Mich. 172, 267 N. W. 608; *Carolene Products Co.* v. *Banning*, 131 Nebr. 429, 268 N. W. 313.

The contents of the can are practically indistinguishable by the buying public from evaporated whole milk, but the cans are truthfully labeled to show the trade names and the ingredients.

The indictment charged the petitioner corporation and the individual petitioners, its president and vice president, with violation of the statute by making interstate shipments of the compounds contrary to § 2.[4]  The convictions and sentences are assailed as improper on three grounds: first, that the petitioner's compounds were not covered by the rationale of the Filled Milk Act; second, that the Act did not cover the compounds because they were not "in imitation or semblance" of a milk product; and third, that since the compounds were wholesome food products and sold without fraud, in any sense, Congress could not constitutionally prohibit their interstate shipment.

*First.*  As a basis for petitioner's position that the Filled Milk Act does not cover their compounds, it is argued that the nutritional deficiencies of filled milks led to the Act's enactment so as to protect the public health.  These deficiencies occurred because the extraction of the butterfat from the whole milk removed a large proportion of the fat soluble vitamins A and D.  The hearings on the bill and the course of the debate make it quite clear that this vitamin deficiency was of major importance in bringing about the enactment of the act.[5]  Petitioners then offered

---

[4] "Sec. 2. . . . It shall be unlawful for any person . . . to ship or deliver for shipment in interstate or foreign commerce, any filled milk.

"Sec. 3. Any person violating any provision of this Act shall upon conviction thereof be subject to a fine of not more than $1,000 or imprisonment of not more than one year, or both; . . ."  42 Stat. 1487.

[5] *United States* v. *Carolene Products Co.*, 304 U. S. 144, 149.  H. Rep. No. 355, 67th Cong., 1st Sess., pp. 3–4; S. Rep. No. 987, 67th

in the trial court to prove that since the passage of the Filled Milk Act in 1923, the technique of fortification of foods with vitamins A and D had advanced to a point where these vitamins could be restored to skim milk compounds so that the compounds were equally valuable in that respect to whole milk products and that their products had been so enriched. The offer was refused.

Filled milk is defined in § 1 (c) of the act as any milk, "whether or not condensed, evaporated, concentrated, powdered, dried, or desiccated, to which has been added, or which has been blended or compounded with, any fat or oil other than milk fat, so that the resulting product is in imitation or semblance of milk . . ., whether or not condensed, evaporated, concentrated, powdered, dried, or desiccated." The petitioner's compounds, it is agreed, fall within this definition. But, petitioners contend, they do not fall within its spirit, since the vitamins which cause deficiency have been restored and that therefore the act is inapplicable to the enriched compounds within that rule of statutory construction, as illustrated by *Church of the Holy Trinity* v. *United States,* 143 U. S. 457; *United States* v. *Aetna Explosives Co.,* 256 U. S. 402, and other cases, which excludes from the coverage of a statute things or situations which are beyond the legislative intent.

Petitioners' position as to the legislative purpose of the act was not accepted by the trial or reviewing court. We agree with those courts. While, as we have stated above, the vitamin deficiency was an efficient cause in bringing about the enactment of the Filled Milk Act, it was not the sole reason for its passage. A second reason was that the compounds lend themselves readily to substitution

Cong., 4th Sess., pp. 3–4; 62 Cong. Rec. pp. 7581, 7616; Hearings, House Committee on Agriculture, H. Res. 6215, 67th Cong., 1st Sess., Vol. I, pp. 144, 176–77; Hearings, Senate Sub-Committee of the Committee on Agriculture and Forestry, H. Res. 8086, 67th Cong., 2d Sess., Vol. I, pp. 27, 48, 67, 89–90, 121–24, 143, 177, 226, 266.

for or confusion with milk products. Although, so far as the record shows, filled milk compounds as enriched are equally wholesome and nutritious as milk with the same content of calories and vitamins, they are artificial or manufactured foods which are cheaper to produce than similar whole milk products. When compounded and canned, whether enriched or not, they are indistinguishable by the ordinary consumer from processed natural milk. The purchaser of these compounds does not get evaporated milk. This situation has not changed since the enactment of the act. The possibility and actuality of confusion, deception and substitution was appraised by Congress.[6] The prevention of such practices or dangers through control of shipments in interstate commerce is within the power of Congress. *United States* v. *Carolene Products Co.*, 304 U. S. at p. 148; cf. *McCray* v. *United States*, 195 U. S. 27, 63. The manner by which Congress carries out this power, subject to constitutional objections which are considered hereinafter in part

---

[6] H. Rep. No. 355, 67th Cong., 1st Sess., p. 2: "The compound can be made more cheaply than the regular article. . . . Filled milk is sold under various trade names. . . . The manufacturers can not sell it as milk, but it is put up in the same size cans as regular condensed milk, and the evidence before the committee shows that it is advertised by the retail dealers as milk and evaporated milk. Storekeepers sell it with the statements that 'it takes the place of milk,' 'just as good as condensed and much cheaper,' 'nothing better on the market,' 'takes the place of condensed milk.' Instances have been found in which the coconut fat was mixed with milk and sold for cream; the compound has been used for making ice cream. . . . In many cases retailers sell the compound for the same price as the straight evaporated milk, although the price per 1-pound can to them is about 3 cents less. A number of surveys in various parts of the country show that the compound is sold largely in sections inhabited by people unable to read English and sections inhabited by people of limited means, and not sold at all in better residential districts." Cf. also S. Rep. No. 987, 67th Cong., 4th Sess., p. 3.

"Third" of this opinion, is within legislative discretion,[7] even though the method chosen is prohibition of manufacture, sale or shipment.[8] Congress evidently determined that exclusion from commerce of filled milk compounds in the semblance of milk was an appropriate method to strike at evils which it desired to suppress. Although it now is made to appear that one evil, the nutritional deficiencies, has been overcome, the evil of confusion remains and Congress has left the statute in effect. It seems to us clear, therefore, that there is no justification for judicial interference to withdraw these assumedly nondeleterious compounds from the prohibitions of the act. It follows from the point of view of the coverage of the

---

[7] *Jacob Ruppert* v. *Caffey*, 251 U. S. 264, 299–301; *Milliken* v. *United States*, 283 U. S. 15, 24. Cf. *Purity Extract Co.* v. *Lynch*, 226 U. S. 192, 201; *Sterling* v. *Constantin*, 287 U. S. 378, 398.

[8] See *Nebbia* v. *New York*, 291 U. S. 502, 528, note 26. To the cases there cited may be added *Patterson* v. *Kentucky*, 97 U. S. 501, upholding the constitutional validity of a state statute prohibiting the sale of oils or fluids which can be used for illuminating purposes if such oils or fluids ignite or permanently burn below 130 degrees Fahrenheit; *Price* v. *Illinois*, 238 U. S. 446, establishing the constitutionality of a state statute prohibiting the sale of a food preservative that contained formaldehyde, hydrofluoric acid, boric acid and salicylic acid; *United States* v. *Hill*, 248 U. S. 420, prohibiting by federal statute the transportation of liquor into a state whose laws forbade only manufacturing and sale; *Crescent Cotton Oil Co.* v. *Mississippi*, 257 U. S. 129, validating a state statute prohibiting a corporation from owning or operating a cotton gin when also interested in the manufacture of cottonseed oil or cottonseed meal; *Whitfield* v. *Ohio*, 297 U. S. 431, holding valid a state statute which prohibited the sale in open market of goods manufactured by convicts or prisoners; *Henderson Co.* v. *Thompson*, 300 U. S. 258, upholding the validity of a state statute prohibiting the use of sweet natural gas for the manufacture of carbon black (see also *Walls* v. *Midland Carbon Co.*, 254 U. S. 300); and *Federal Security Administrator* v. *Quaker Oats Co.*, 318 U. S. 218, holding valid an administrative regulation prohibiting manufacture of "farina" enriched solely with vitamin D.

act that it was not erroneous to refuse to consider the evidence which petitioners offered as to the wholesomeness of the compounds.

*Second.* The petitioners urge another reason why the act does not cover their compounds. This ground is that the compounds are not "in imitation or semblance" of milk within the meaning of the act's definition of filled milk. § 1 (c), *supra,* p. 22. Compare *State* v. *Carolene Products Co.,* 346 Mo. 1049, 1060–62, 144 S. W. 2d 153. We agree that the product must be in imitation or semblance of milk to fall within the prohibition of the act.

Petitioners rely upon the admitted fact that no ingredient is added to the skim milk, oil and vitamins to alter the appearance of the compound. Accepting the evidence that the compounds are indistinguishable from whole milk products by purchasers, it is urged that they cannot be held to be in "imitation or semblance" of milk unless the manufacturer purposefully adds something to make the mixture simulate milk. It is said Congress adopted this language from § 64 (3) of the Farms and Markets Law of New York.[9] Prior to that time, the Court of Appeals of New York, in construing the words "imitation or semblance" as they appeared in another section of the New York law directed at the regulation of oleomargarine, had interpreted them as denouncing trade in oleomargarine only when the manufacturer consciously and purposefully attempted to create an imitation or semblance of milk products. *People* v. *Guiton,* 210 N. Y.

[9] Sec. 64 (3). "No person shall manufacture, sell or exchange, offer or expose for sale or exchange, or have in his possession with the intent to sell or exchange any condensed, evaporated, concentrated, powdered, dried or desiccated milk, cream or skimmed milk to which there has been added or with which there has been mixed, blended or compounded, any fats or oils, other than milk fat, so that the finished product shall be in imitation or semblance of condensed, evaporated, concentrated, powdered, dried or desiccated milk." N. Y. Laws 1922, ch. 365, § 64, as amended.

1, 8, 9, 103 N. E. 773. The adoption of these words after this interpretation and in the face of the Congressional knowledge of the New York decision and of the controversy over the effect of the use of such language,[10] petitioners contend, brings into play the general rule that adoption of the wording of a statute from another legislative jurisdiction carries with it the previous judicial interpretations of the wording. *Willis* v. *Eastern Trust & Banking Co.*, 169 U. S. 295, 307; cf. *James* v. *Appel*, 192 U. S. 129, 135; *Joines* v. *Patterson*, 274 U. S. 544, 549.

The cases just cited have established under suitable conditions the rule for which petitioners contend that the interpretation goes with the act. It is a presumption of legislative intention, however, which varies in strength with the similarity of the language, the established character of the decisions in the jurisdiction from which the language was adopted and the presence or lack of other indicia of intention. *Copper Queen Mining Co.* v. *Arizona Board*, 206 U. S. 474, 479; *Whitney* v. *Fox*, 166 U. S. 637, 647.

Here we cannot be sure that Congress, deliberately or otherwise, adopted the wording from the New York statute. In § 2 of the federal act of August 2, 1886, 24 Stat. 209, taxing and regulating oleomargarine, somewhat similar language occurs.[11] That may be the source of the

---

[10] Hearings, Senate Sub-Committee of the Committee on Agriculture and Forestry, H. Res. 8086, 67th Cong., 2d Sess., pp. 219, 221–22, 248–49.

[11] "SEC. 2. That for the purposes of this act certain manufactured substances, certain extracts, and certain mixtures and compounds, including such mixtures and compounds with butter, shall be known and designated as 'oleomargarine', namely: All substances heretofore known as oleomargarine, oleo, oleomargarine-oil, butterine, lardine, suine, and neutral; all mixtures and compounds of oleomargarine, oleo, oleomargarine-oil, butterine, lardine, suine, and neutral; all lard extracts and tallow extracts; and all mixtures and compounds of tallow, beef-fat, suet, lard, lard-oil, vegetable-oil annotto, and other

phrase. Furthermore the *Guiton* case did not interpret the section of the New York statute upon which petitioners contend the federal act is modeled. In the *Guiton* case, the Court of Appeals explained the force of "imitation and semblance" as used in the oleomargarine section, § 38, N. Y. Laws 1909, ch. 9. That court relied upon the special statutory definition of oleomargarine in § 30, *id.*, as a reason for its conclusion that the words prohibited only conscious imitation, 210 N. Y. 7. Oleomargarine was there defined as an article "in the semblance of butter." The court thought that as the sale of natural oleomargarine, which might have the "semblance" of butter was permitted, it was not intended to prohibit products which looked like butter unless the imitation came from choice. As no corresponding definition of filled milk occurs, there could be no certainty that the same result would be reached, if New York had been called upon to interpret section 64.

Finally, as determinative of the intention of Congress to include compounds whose resemblance to milk products arises from their ingredients and not from conscious effort, we note the fact that compounds of this innocent character were specifically included by name in the list of compounds which the Congressional reports pointed out as products which were covered by the proposed act.[12] Petitioner's compounds were themselves so named. The addition of vitamins does not affect their physical likeness to milk products.

*Third.* If the Filled Milk Act is applicable to the compounds whose shipment was the basis of the indictment in this case, as we have just concluded, petitioners assert

coloring matter, intestinal fat, and offal fat made in imitation or semblance of butter, or when so made, calculated or intended to be sold as butter or for butter." 24 Stat. 209.

[12] S. Rep. No. 987, 67th Cong., 4th Sess., p. 3; H. Rep. No. 355, 67th Cong., 1st Sess., p. 2; 64 Cong. Rec. pp. 3951, 7593.

that the act, as thus applied, violates the due process clause of the Fifth Amendment. Their argument runs in this manner. Since these enriched compounds are admittedly wholesome and sold under trade names with proper labels without the commission of any fraud by petitioners on the public, Congress cannot prohibit their interstate shipment without denying to petitioners a right protected by the due process clause, the right to trade in innocent articles. They rely upon *Weaver* v. *Palmer Bros. Co.*, 270 U. S. 402, and continue their protest against the refusal of the trial court to receive the evidence as to the wholesomeness of their product.

We do not need to consider the refusal of the trial court to receive evidence of the purity and wholesomeness of petitioner's products. Such evidence could be material only if the sole basis for Congressional action was impurity and unwholesomeness.[13] Under the first point of this opinion, we have determined that the avoidance of confusion furnished a reason for the enactment of the Filled Milk Act. The trial court took judicial notice, as did the District Court of the District of Columbia, *United States* v. *Carolene Products Co.*, 51 F. Supp. 675, 678–79, and as we do, of the reports of the committees of the House of Representatives and the Senate which show that other considerations than nutritional deficiencies influenced the prohibition of the shipment of filled milk in interstate commerce. These unchallenged reports, as we indicated

---

[13] See American Law Institute, Model Code of Evidence, ch. 9, Rules 801, 802, 803, pp. 319–22; Bikle, Judicial Determination of Questions of Fact Affecting the Constitutional Validity of Legislative Action, 38 Harv. L. Rev. 6; Note, The Presentation of Facts Underlying Constitutionality of Statutes, 49 Harv. L. Rev. 631; Morgan, Judicial Notice, 57 Harv. L. Rev. 269, 291–94; Note, 30 Col. L. Rev. 360; Wigmore, Evidence (3d Ed.), § 2555 (d), p. 522; *Borden's Co.* v. *Baldwin*, 293 U. S. 194, 209; *United States* v. *Carolene Products Co.*, 304 U. S. 144, 153–54.

in part "First" above, furnish an adequate basis, other than unwholesomeness, for the action of Congress.[14]   The reports show that it was disputable as to whether wholesome filled milk should be excluded from commerce because of the danger of its confusion with the condensed or evaporated natural product or whether regulation would be sufficient.   The power was in Congress to decide its own course.   We need look no further.[15]

*Weaver* v. *Palmer Bros. Co., supra,* is not to the contrary.   This Court thought that under the facts of that record there was no reasonable basis for the legislative determination that the use of shoddy in comfortables was dangerous to the public health or that it offered opportunity for deception, pp. 412 and 414.   Therefore the prohibition of its use violated the due process clause of the Fourteenth Amendment.   Sterilization, inspection and labeling were deemed to be sufficient to negative the possibility of such evils.   It was pointed out in the course of the opinion, p. 413, that where the possibility of evil was not negatived, legislation prohibiting the sale of a wholesome article would not be invalidated.   *Powell* v. *Pennsylvania,* 127 U. S. 678.   In dealing with the evils of filled milk, Congress reached the conclusion that labeling was not an adequate remedy for deception.   On the point of the constitutionality in relation to due process of the prohibition of trade in articles which are not in themselves dangerous but which make other evils more difficult

---

[14] *West India Oil Co.* v. *Domenech,* 311 U. S. 20, 28; *United States* v. *Stewart,* 311 U. S. 60, 64; *Neuberger* v. *Commissioner,* 311 U. S. 83, 85, n. 1; *Milk Wagon Drivers' Union* v. *Lake Valley Co.,* 311 U. S. 91, 101–103; *Federal Communications Comm'n* v. *Columbia Broadcasting System,* 311 U. S. 132, 137; *Taft* v. *Helvering,* 311 U. S. 195, 197, n. 4.

[15] Cf. *Zahn* v. *Board of Public Works,* 274 U. S. 325, 326, 328; *Sproles* v. *Binford,* 286 U. S. 374, 388–89; *Olsen* v. *Nebraska,* 313 U. S. 236, 246.

30

to control, such as confusion in the filled milk legislation, the *Powell* case is authority for the validity of Congressional action in the Filled Milk Act. It involved a sale of an article assumed to be just as good as butter but which was prohibited because of its ingredients. In the *Powell* case, this Court said:

"The defendant then offered to prove by Prof. Hugo Blanck that he saw manufactured the article sold to the prosecuting witness; that it was made from pure animal fats; that the process of manufacture was clean and wholesome, the article containing the same elements as dairy butter, . . . that the oleaginous substances in the manufactured article were substantially identical with those produced from milk or cream; and that the article sold to the prosecuting witness was a wholesome and nutritious article of food, in all respects as wholesome as butter produced from pure unadulterated milk or cream from unadulterated milk." Pp. 681–82.

"It will be observed that the offer in the court below was to show by proof that the particular articles the defendant sold, and those in his possession for sale, in violation of the statute, were, in fact, wholesome or nutritious articles of food. It is entirely consistent with that offer that many, indeed, that most kinds of oleomargarine butter in the market contain ingredients that are or may become injurious to health. The court cannot say, from anything of which it may take judicial cognizance, that such is not the fact. . . .

"Whether the manufacture of oleomargarine, or imitation butter, of the kind described in the statute, is, or may be, conducted in such a way, or with such skill and secrecy, as to baffle ordinary inspection, or whether it involves such danger to the public health as to require, for the protection of the people, the entire suppression of the business, rather than its regulation in such manner as to permit the manufacture and sale of articles of that class

that do not contain noxious ingredients, are questions of fact and of public policy which belong to the legislative department to determine. And as it does not appear upon the face of the statute, or from any facts of which the court must take judicial cognizance, that it infringes rights secured by the fundamental law, the legislative determination of those questions is conclusive upon the courts." Pp. 684–85.

In *Hebe Co.* v. *Shaw,* 248 U. S. 297, this Court in 1919 upheld the validity of an Ohio statute which prohibited the sale of condensed milk made otherwise than from whole milk against an attack under the Fourteenth Amendment. It was assumed that the compound was wholesome and it was properly labeled. The act was sustained, however, as a proper exercise of legislative power to protect the public against fraudulent substitution, pp. 302–303. *Purity Extract Co.* v. *Lynch,* 226 U. S. 192, 204.

In the action of Congress on filled milk there is no prohibition of the shipment of an article of commerce merely because it competes with another such article which it resembles. Such would be the prohibition of the shipment of cotton or silk textiles to protect rayon or nylon or of anthracite to aid the consumption of bituminous coal or of cottonseed oil to aid the soybean industry. Here a milk product, skimmed milk, from which a valuable element—butterfat—has been removed is artificially enriched with cheaper fats and vitamins so that it is indistinguishable in the eyes of the average purchaser from whole milk products. The result is that the compound is confused with and passed off as the whole milk product in spite of proper labeling.

When Congress exercises a delegated power such as that over interstate commerce, the methods which it employs to carry out its purposes are beyond attack without a clear and convincing showing that there is no rational basis for

the legislation; that it is an arbitrary fiat.[16]  This is not shown here.   The judgment is

*Affirmed.*

MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS concur in the result.

---

[16] *United States* v. *Carolene Products Co.,* 304 U. S. 144, 153–54; *Hebe Co.* v. *Shaw,* 248 U. S. 297, 304; *Munn* v. *Illinois,* 94 U. S. 113, 132; *South Carolina Highway Dept.* v. *Barnwell Bros.,* 303 U. S. 177, 191–92; *Carmichael* v. *Southern Coal  Co.,* 301 U. S. 495, 509; *Townsend* v. *Yeomans,* 301 U. S. 441, 451; *O'Gorman & Young* v. *Hartford Ins. Co.,* 282 U. S. 251, 257–58; *Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146, 163; *Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342, 357.