427 F.2d 511
 CORN PRODUCTS COMPANY, Petitioner,
v.
DEPARTMENT OF HEALTH, EDUCATION AND WELFARE, FOOD AND DRUG ADMINISTRATION, Respondent.
DERBY FOODS, INC., Petitioner,
v.
FOOD & DRUG ADMINISTRATION, U. S. Department of H.E.W., Respondent.
 No. 17526.
 No. 17689.
 United States Court of Appeals, Third Circuit.
 Argued September 29, 1969.
 Decided May 14, 1970.
 Rehearings Denied June 22, 1970.
 
 William F. Cody, New York City (James M. Orman, Philadelphia, Pa., Vincent A. Kleinfeld, Stanley J. Krieger, Washington, D. C., Arthur C. O'Meara, Harvey L. Hensel, Chicago, Ill., Earl G. Spiker, Washington, D. C., on the brief), for Derby Foods, Inc.
 Alan H. Kaplan, Kleinfeld & Kaplan, Washington, D. C. (Warren S. Adams, 2nd, New York City, Richard P. Brown, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., on the brief), for Corn Products Co.
 William W. Goodrich, Asst. Gen. Counsel, Food, Drug & Environmental Health Division, Washington, D. C. (Will Wilson, Asst. Atty. Gen., Criminal Division, Harold P. Shapiro, Chief, Administrative Regulations Section, Dept. of Justice, Eugene M. Pfeifer, Atty., Department of Health, Education & Welfare, Washington, D. C., on the brief), for respondents.
 Before STALEY, SEITZ and STAHL,* Circuit Judges.
 OPINION OF THE COURT
 STALEY, Circuit Judge.
 
 
 1
 Corn Products Company and Derby Foods, Inc.,[1] petition for review of an order of the Food and Drug Administration, Department of Health, Education and Welfare, which establishes a definition and standard of identity for the food product known as peanut butter.[2] They seek this review because their products, as they were formulated at the time of the order, fail to conform to the standard.[3]
 
 
 2
 The order was promulgated under Section 401 of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 341.[4] Basically, it limits the percentage by weight of optional ingredients which may be added to the peanut ingredient to a maximum of ten per cent. It allows for the addition or removal of peanut oil and limits the fat content to 55 per cent. The standard also identifies allowable additives and specifies certain labelling requirements.[5]
 
 
 3
 As originally constituted, peanut butter was composed of ground peanuts, salt, and sometimes sugar. However, this product had the disadvantages of oil separation, stickiness, short shelf-life, etc. These deficiencies have been diminished, if not eliminated, by the addition of stabilizing ingredients, hydrogenated vegetable oils. Today, peanut butter consists of the peanut ingredient, which has a solid component and an oil component, the stabilizer, and seasonings.
 
 
 4
 Petitioners are the major producers of peanut butter. Each has enjoyed a high degree of success. In 1965 Corn Products, the industry leader, claimed 22 per cent of the market for its brand, Skippy. Derby as the second leading producer had 14 per cent of the market from its product, Peter Pan.[6] Their product formulations fail to qualify under the standard since each uses in excess of ten per cent of optional ingredients as these are defined by the standard, but each for a different reason.
 
 
 5
 Both petitioners were unsuccessful in urging the Food and Drug Administration to adopt a standard which would allow 13 per cent of optional ingredients, i. e., consist of 87 per cent peanuts. Corn Products urges here that the adoption of the 90 per cent standard was unreasonable and arbitrary and that the standard will not promote honesty and fair dealing in the interest of consumers. It also argues that the findings upon which the order is based are not supported by substantial evidence. Both petitioners contend that they were entitled to specific findings as to why their products were eliminated.[7] Since this is an appeal from an order of an administrative agency, our first concern must be the extent of our authority to review the order.
 
 
 6
 The scope of review of the appellate court in considering such orders is defined by the Federal Food, Drug, and Cosmetic Act and the Administrative Procedure Act. Section 701(f) (3) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 371(f) (3), provides:
 
 
 7
 "The findings of the Secretary as to facts, if supported by substantial evidence, shall be conclusive."
 
 
 8
 Section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706, provides:
 
 
 9
 "* * * [T]he reviewing court shall * * * (2) hold unlawful and set aside agency action, findings, and conclusions found to be * * *
 
 
 10
 "(E) unsupported by substantial evidence * * *."
 
 
 11
 The Supreme Court has found the "substantial evidence" test to be the same under the Administrative Procedure Act as under the Taft Hartley Act. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). This court has applied the teaching of Universal Camera to petitions for review of an order under the Federal Food, Drug, and Cosmetic Act, Cream Wipt Food Products Co. v. Federal Security Administrator, 187 F.2d 789 (C.A. 3, 1951); see also, Atlas Powder Co. v. Ewing, 201 F.2d 347 (C.A. 3, 1952), cert. denied, 345 U.S. 923, 73 S.Ct. 783, 97 L.Ed. 1355 (1953).
 
 
 12
 The Supreme Court has indicated that substantiality must be determined in the light of all that the record relevantly presents; that findings must be set aside when the record clearly precludes the agency's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both; and, that "reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function." Universal Camera Corp. v. NLRB, 340 U.S. at 490, 71 S.Ct. at 466.
 
 
 13
 The Commissioner has concluded that adoption of a standard will promote honesty and fair dealing in the interest of consumers. Support for this conclusion is found in the findings. There is a general lack of information among consumers about the actual composition of peanut butter. It was found that a trend toward a decrease in peanut content has not always been in the interest of consumers. Another finding demonstrates that other ingredients are cheaper and that in some cases the reduced peanut content has resulted from competitive pressure. It was further found that some consumers and state agencies recognize a need for regulation in this area. These findings are supported by sufficient rational probative evidence to afford a sound basis for the exercise of the Commissioner's judgment to promulgate a standard of identity. See Federal Security Administrator v. Quaker Oats Co., 318 U.S. 218, 63 S.Ct. 589, 87 L.Ed. 724 (1943).
 
 
 14
 In support of its argument that the adoption of the standard requiring 90 per cent peanuts is arbitrary and unreasonable, Corn Products cites its market success, market history, established trade practices, and urges that the purpose of the Act, to prevent confusion and deception among consumers, would be served by a standard which would allow its product to be sold as it is presently formulated. It is at once apparent that this argument is not aimed at debasing the findings and conclusions upon which the order is based, but is rather an argument in support of a standard which would not require Corn Products to change the composition of Skippy.
 
 
 15
 The court's function, however, is to review the findings to determine if there is substantial evidence to support them. Because the court must consider the evidence in keeping with the normal judicial function, Universal Camera Corp. v. NLRB, supra, the issue of reasonableness would not appear to be completely beyond judicial reach. However, due regard must be given to the integrity of the administrative function. Given a range of reasonable alternatives, the administrator is given the task of selecting the one which, in his judgment, is most appropriate. In such circumstances, the court must defer to his judgment. Federal Security Administrator v. Quaker Oats Co., supra.
 
 
 16
 Using an affirmative approach to the order under consideration, the issue becomes whether the findings upon which the 90 per cent standard is based are supported by substantial evidence. Corn Products' argument that the standard should have designated partially hydrogenated peanut oil as peanut ingredient must be directed at those findings which equate them.
 
 
 17
 Skippy fails to comply with the standard because it contains 8½ per cent of partially hydrogenated peanut oil and an amount of seasonings which together exceed the ten per cent limit on optional ingredients. No distinction is made in the standard between hyrogenated peanut oil and other hydrogenated vegetable oils.
 
 
 18
 Nine findings of fact deal directly with hydrogenated oils. These hydrogenated vegetable oils were found to resemble each other more than the oils from which they were derived, although many of the properties of the source oils are retained. Hydrogenation, a process by which unsaturated fats are changed to saturated fats through the addition of hydrogen, causes the physical properties, e. g., melting points, to differ from the source oils. The hydrogenated oils are said to be odorless. Four expert witnesses, all chemists, testified to the dissimilarity between vegetable oil and hydrogenated oil. There was testimony that there is no nutritional variation between these oils. The basic function of the hydrogenated oil, to prevent oil separation in the product, is said to be served regardless of the source oil. The use of hydrogenated peanut oil does not add flavor to the product. From the foregoing, it is quite clear that there is substantial evidence to support a conclusion which makes no distinction between hydrogenated vegetable oils. This conclusion rests upon expert testimony and it is well settled that such testimony is sufficient.[8] Erickson v. Federal Trade Commission, 272 F.2d 318, 321 (C.A. 7, 1959), cert. denied, 362 U.S. 940, 80 S.Ct. 805, 4 L.Ed.2d 769 (1960). Also see Federal Security Administrator v. Quaker Oats Co., supra.
 
 
 19
 The Peter Pan formulation, by using 9.6 per cent dextrose, 1.7 per cent stabilizer, and 1.7 per cent seasoning, exceeds the ten per cent optional ingredient limitation. Finding of Fact No. 16 indicates that sweetening agents of various intensities are available. Amounts of sweeteners used range as high as nine per cent of the more potent sweeteners and up to 14 per cent of the least potent. From surveys conducted in 1963 and 1965, it was found that some producers increased the amount of sweetener with the resultant reduction in the amount of peanuts. Testimony of witnesses and surveys support these statements.
 
 
 20
 It was also found that the use of optional ingredients, while to some extent required for product improvement, was in response to competitive pressure, since peanuts are the most expensive component. By limiting the amount of optional ingredients, the effect of the order is to require the use of a more potent sweetener in smaller amounts in combination with stabilizer and salt. Since the Commissioner may act to prevent economic adulteration of a product, Federal Security Administrator v. Quaker Oats Co., supra, the optional ingredients limitation may be seen as an attempt to prevent such an occurrence.
 
 
 21
 Other findings relate to the 90 per cent requirement. The surveys conducted in 1963 and 1965 support the finding that a majority of manufacturers produced peanut butter containing 90 per cent of peanuts. Further, it was found that other manufacturers who then would not comply with the standard had in the past produced a 90 per cent peanut product. It is noted that compliance with the standard will not require a change of equipment. Expert testimony indicates that for those presently not in compliance only an alteration of formula is necessary.
 
 
 22
 Inferentially, petitioners contend that an 87 per cent standard would satisfy the purposes of the Act, and there may be substantial evidence to support a standard which would allow their products to be marketed as formulated. Assuming without deciding that to be so, this does not militate against the conclusion that the findings are supported by substantial evidence. In addition, it does not compel the conclusion that the choice of the 90 per cent level is arbitrary and unreasonable. It would simply indicate that a reasonable standard could have been established which would not require petitioners to change their formulations. Where equally reasonable alternatives are available, the court must defer to the exercise of administrative discretion.
 
 
 23
 Perhaps the most troubling of the points raised by petitioners is that there exists within the terms of the standard and definition of identity the means for subverting its intent. It is clear that the intent is to provide a practical maximum of peanut ingredient. The standard provides: "During processing, the oil content of the peanut ingredient may be adjusted by the addition or subtraction of peanut oil. The fat content of the finished foods shall not exceed 55 per cent * * *." Petitioner Corn Products demonstrates that this allows the production of a peanut butter containing only 68 per cent peanuts. This is not disputed, but a government witness stated that such a possibility is more hypothetical than real. Petitioners contend that it is unreasonable to exclude their products, which contain approximately 87 per cent peanuts as defined under the standard, while at the same time including the possibility for making 68 per cent peanut butter.
 
 
 24
 This provision is based upon findings that some adjustment of the oil content of the peanuts is necessary to account for crop variations. Testimony indicated that the oil content of peanuts is a variable. A government witness testified that some provision for the addition and removal of oil was necessary and and that it would reflect a good commercial practice. Corn Products admits that addition and removal of peanut oil is an established practice. Should a manufacturer market a 68 per cent product, it is apparent that this would violate the spirit if not the letter of the order. Of course, the order is capable of being modified to meet such an eventuality. Certainly, it could not be asserted that a standard is only reasonable if it provides for every possibility. Such an assertion must fall of its own weight, for language which circumscribes conduct is no match for human ingenuity.
 
 
 25
 Finally, petitioners contend that that they are entitled to specific findings containing reasons for the exclusion of their product formulations. They are unable, however, to cite any direct authority for such a contention. Respondent answers that such findings are not required since this is a rule-making activity.
 
 
 26
 Specific findings have been made concerning objections of parties opposed to such an order, Willapoint Oysters, Inc. v. Ewing, 174 F.2d 676 (C.A. 9), cert. denied, 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527 (1949). Among the cases relied on by petitioners is A. E. Staley Mfg. Co. v. Secretary of Agriculture, 120 F.2d 258 (C.A. 7, 1941). However, that case does not support their position. There, the court in denying rehearing amended its opinion to delete a requirement that a specific finding be made as to the exclusion of petitioner's product. Instead, it suggested a specific finding and further stated, "Perhaps an explanation as to its disposition of petitioner's evidence would be sufficient," A. E. Staley Mfg. Co., 120 F.2d at 261. In this case, the Commissioner recognized the positions of the petitioners in the preamble to the order. There was a recognition that they would be adversely affected by its conclusions. We are of the opinion that this is sufficient specificity.[9]
 
 
 27
 Upon a review of the record, we conclude that the Commissioner acted within his authority in promulgating the standard and definition of identity. The findings are supported by substantial evidence and the conclusions rationally follow from the findings.
 
 
 28
 The standard reflects the practice of a number of manufacturers and to those not in compliance there will be no economic hardship in complying. The fact of exclusion of the leading producers does not make the regulation unreasonable. Products have been excluded before. See, e. g., Federal Security Administrator v. Quaker Oats Co., supra. Skippy and Peter Pan will not be banned; merely a change in product formula will be required. "[I]t is an essence of legislation, functionally speaking, that in its immediate effect, it hurts some and benefits other members of society." Willapoint Oysters, Inc. v. Ewing, 174 F.2d at 694.
 
 
 29
 The order will be affirmed.
 
 
 
 Notes:
 
 
 *
 Judge Stahl heard the argument and participated in the consideration of this appeal but not in the decision which occurred after his death
 
 
 [1]
 Because of the prior pendency of the petition of Corn Products before this court, Derby Food's petition to the United States Court of Appeals for the Seventh Circuit was transferred here in compliance with 28 U.S.C. § 2112
 
 
 [2]
 The standard is set forth at 21 C.F.R. § 46.1 (1970)
 
 
 [3]
 Failure to comply with a standard and definition of identity subjects the violator to the penalty provisions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 331, 333 (1967)
 
 
 [4]
 The order was issued under authority of a deputy commissioner to whom such authority has been delegated. 21 C.F.R. §§ 2.120, 2.121 (1970)
 
 
 [5]
 Procedurally, the statutory requirements have been fulfilled, 21 U.S.C. § 371. The initial order issued June 25, 1959, 24 Fed.Reg. 5391 (July 2, 1959). Objections caused a revision, and a second order was published, 26 Fed.Reg. 11209 (Nov. 28, 1961), but its effectiveness was stayed, 27 Fed.Reg. 943 (Feb. 1, 1962). After a proposed revision, 29 Fed.Reg. 15173 (Nov. 10, 1964), and a third order, 30 Fed.Reg. 8626 (July 8, 1965), objections were filed and a public hearing was requested. Notice of the hearing was given, 30 Fed.Reg. 11970 (Sept. 18, 1965), and a hearing was held. The order appealed from issued, 33 Fed.Reg. 10506 (July 24, 1968)
 
 
 [6]
 The market percentages quoted are taken from Corn Product's brief and are not in dispute
 
 
 [7]
 Corn Products raises an additional issue, asserting a taking of property in violation of the Fifth Amendment. It has been held that wholesome food products may be banned by legislative action, Carolene Products Co. v. United States, 323 U.S. 18, 65 S.Ct. 1, 89 L.Ed. 15 (1944); Hebe Co. v. Shaw, 248 U.S. 297, 39 S.Ct. 125, 63 L.Ed. 255 (1919)
 
 
 [8]
 Corn Products asserts that evidence concerning the significance of its process of hydrogenation was disregarded by the Commissioner. It elicited testimony from its witnesses that use of its hydrogenated oil resulted in a product with greater flavor accessibility and less waxy taste in the mouth. However, the fact that a theory was not accepted does not mean that the evidence was disregarded, since it is the function of the administrative agency as the trier of fact to assess the credibility of witnesses and resolve conflicting evidence. See, e. g., W. J. Dillner Transfer Co. v. United States, 277 F. Supp. 420 (W.D.Pa., 1967)
 
 
 [9]
 While the activity of regulation is essentially legislative, Federal Security Administrator v. Quaker Oats Co., supra; Willapoint Oysters, Inc. v. Ewing, supra, we are not prepared to state that in an appropriate situation specific findings could not be required