### LAKELAND HIGHLANDS CANNING CO., Inc., et al. v. MAYO, Commissioner of Agriculture of Florida, et al.

### No. 89.

District Court, S. D. Florida,
Tampa Division.

May 3, 1939.

Knight, Thompson & Sutton, of Tampa, Fla., for plaintiff.

Wm. C. Pierce, of Tampa, Fla., for defendants.

E. Glenn Grimes, of Bradenton, Fla., for Florida Citrus Commission.

---

Ed. R. Bentley, of Lakeland, Fla., for Florida Growers, Inc.

Before McCORD, Circuit Judge, and ERVIN and AKERMAN, District Judges.

ERVIN, District Judge.

This case was argued and submitted on April 10, 1939, on the bill and testimony.

The defendants appeared and though they had not filed answers, argued the case and requested the Court to pass on all questions presented, and especially on the constitutionality of the Act involved.

The Act is found in Florida Acts of 1935, c. 16862, p. 268 (Growers' Cost Guarantee Law):

"An Act Relating to Citrus Fruit: Prescribing Conditions and Limitations Upon the Sale, Marketing and Processing Thereof, and the Effect of Contracts of Sale and of Marketing and Processing Agreements.

"Whereas, it is found by the Legislature and hereby declared that the production and distribution of citrus fruit is a paramount industry in Florida upon which the prosperity of the State in a large measure depends; that such fruit and the juices thereof have become and are generally used in great and rapidly increasing quantities, both voluntarily and upon advice of physicians, by people of all classes, ages and conditions; that it is necessary for the reasonable comfort, welfare, and health of the people and in order to build up their strength and vigor that an adequate and dependable supply of high grade citrus fruit be constantly available, and the production, transportation, processing, distribution and sale of citrus fruit in the State of Florida is therefore hereby declared to be a business affecting the public health and interest, that unfair, unjust, destructive, demoralizing, and uneconomic trade practices have been and are continuing to be carried on in the sale and distribution of citrus fruit in this state to the extent that such fruit has been and is continuing to sell in many cases at prices below the cost of production and the constant, dependable and adequate supply of such fruit for sale and consumption is thereby so seriously imperiled as to threaten the break down of the industry; that the present acute economic condition in Florida is in part the consequence of a severe and increasing disparity between the prices of citrus fruit and other commodities; that it is both expedient and necessary to build up the quality and reputation of Florida's citrus fruit in the market and to stabilize the Florida citrus industry and to protect the public and the growers against fraud, deception, and financial loss through further continuation of unscrupulous practices and haphazard methods in connection with the marketing of citrus fruits, and to that end, to assure the grower returns at least equal to the cost of production of high grade citrus fruit.

"Therefore, in the exercise of the police power of the State, for the purpose of protecting and promoting the public health and general welfare.

*    *    *    *    *    *

"Section 3. The Commissioner of Agriculture in his discretion and by and with the consent and advice of the Governor shall have the power to declare the existence of a State Emergency in the Citrus Industry, and upon petition or petitions signed by persons, firms, corporations, or associations, owning or controlling 50% or more of the producing acreage of citrus fruit, requesting such action, being filed with the Citrus Commission, such percentage to be based upon the survey heretofore made by the Federal Emergency Relief Administration and supplemented by such further surveys as the Citrus Commission from time to time may make, and after the Citrus Commission shall have procured from the producers, shippers, or handlers of citrus fruit, not subject to the provisions of this Act, binding agreements to conform thereto and abide by its terms, the Florida Citrus Commission shall determine and record in permanent form annually the average reasonable cost per standard packed box of producing citrus fruit and every contract, agreement, plan or arrangement with the grower by or under which his citrus fruit shall be bought, marketed, or processed shall be held to require that the person, firm, corporation, or association buying, marketing or processing said citrus fruit shall in any event pay the grower said cost of production, to be ascertained by multiplying the said cost per standard packed box as shown by the record of the Commission current at the time the contract, agreement, plan of arrangement with the grower shall be made, by the number of packed boxes so bought, marketed and

46

processed during the season or under the particular contract, agreement, plan or arrangement if for less than a marketing season. Any contract, plan, scheme or device whereby it shall be attempted to preclude the grower from recovering such cost of production shall to that extent be held to be unlawful and against the public policy of this State, but in all other respects and particulars contracts of sale, marketing and processing shall be valid and binding and the terms thereof shall measure the rights of the respective parties."

We are not concerned with Sections 1 and 2, but the provisions of Section 3 raise all the questions with which we are concerned.

Taking up these in the order of their importance, we consider whether it violates the due process clause of the Fourteenth Amendment, U.S.C.A.Const. We are aware of the fact that many of the later decisions on the due process clause have gone far beyond the earlier ones.

The latest authoritative decision in which this question is discussed is West Coast Hotel Co. v. Parrish, 300 U.S. 379, 391, 57 S.Ct. 578, 581, 81 L.Ed. 703, 108 A.L.R. 1330, which says:

"The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation, the Constitution does not recognize an absolute and uncontrollable liberty. Liberty in each of its phases has its history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals, and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process.

"This essential limitation of liberty in general governs freedom of contract in particular. More than twenty-five years ago we set forth the applicable principle in these words, after referring to the cases where the liberty guaranteed by the Fourteenth Amendment had been broadly described.

" 'But it was recognized in the cases cited, as in many others, that freedom of contract is a qualified, and not an absolute, right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.' " Chicago B. & Q. R. Co. v. McGuire, 219 U.S. 549, 565, 31 S.Ct. 259, 55 L.Ed. 328.

■ The definition of due process here given contains two positive requirements. First: the regulation must be as applied to the citrus business, reasonable. To be reasonable it must not be arbitrary, nor should it be unjust to any of those whom it undertakes to regulate. Second: it must have been adopted in the interests of the community. In other words, the community or the public must have an interest in or be concerned with such regulation.

■ The protection of the public should be the prime purpose of the regulation and not the business to be regulated.

Take the citrus industry as a whole and it is manifest that it is as much dependent on the canners as upon the growers, for we all know that the fruit in its natural state cannot be stored for future sale as grain is done, but that the juices when processed and canned can be. So if a crop is raised too large to be sold as gathered, the price of the fruit will be greatly reduced and the loss much greater than if the excess fruit is canned and the juices stored for future sale. The canner who processes the fruit and preserves the juice plays an important part in buying the excess fruit and processing it. The Act recognizes the canners in the reference to "the fruit and the juices thereof", and to processing the same.

The testimony showed that this year's crop is large, and the Citrus Commission fixed the cost to the grower of raising the crop of grape fruit at thirty-two cents a box, and that the canner could not pay that price and the cost of processing it and sell the juice without suffering a loss.

It further showed that the canners had established businesses of years standing with a large investment, employing several thousand employees.

That they had made contracts for sale of juice for future delivery and that they were forced to cancel when the cost price was fixed by the Commission.

The effect of this was that the canners were penalized for the benefit of the growers if the canners continued business.

The testimony also showed that many of the growers had organized cooperative corporations to process their grape fruit. The cooperative did not pay cash for their fruit to these growers, but credited them with the amount of the price of the fruit and were not expected to pay for it unless the market prices enabled them to pay it, and the Commissioner did not enforce payment while requiring payment of the regular canners.

This certainly was discrimination against the canners, and the Commissioner must have construed the Act so as to authorize him to do this.

The Act makes a sale for less than the price fixed unlawful. Suppose the price fixed by supply and demand is less than that fixed by the Commission, a sale by a grower for any less price would be unlawful.

If his actual cost of raising his crop were ten thousand dollars, he could not sell it for eight thousand dollars and so minimize his loss, but would be compelled to let it spoil on the trees and so lose the whole crop.

Is not this alone sufficient to make the Act arbitrary and prejudicial? We find the Act unconstitutional.

There is one other feature of the Act which may not render it violative of the Constitution, but certainly requires enjoining the Commissioner from enforcing the fixed price.

The Act provides that after the Citrus Commission shall have procured from producers, shippers, or handlers of citrus fruit, not subject to the provisions of this Act, binding agreements to conform thereto and abide by its terms, the Florida Citrus Commission shall determine and record in permanent form annually the annual reasonable cost per standard box, of producing citrus fruit, etc.

There is no proof in the record of any such consent and agreement having been secured by the Commission.

We therefore conclude that the injunction should be granted.