FAMILY SECURITY LIFE INS. CO. et al.
v. DANIEL, Attorney General of South
Carolina, et al.

Civil Action No. 1918.

District Court, E. D. South Carolina,
Columbia Division.

Aug. 12, 1948.

DOBIE, Circuit Judge, dissenting.

Donald Russell, C. Erskine Daniel, E. W. Johnson, and T. Sam Means, Jr., all of Spartanburg, S. C., for plaintiffs.

John M. Daniel, Atty. Gen. of South Carolina, T. C. Callison, Asst. Atty. Gen. of South Carolina, Edgar A. Brown, of Barnwell, S. C., D. W. Robinson, of Columbia, S. C., and R. N. Ward, of Greenville, S. C., for defendants.

Before DOBIE, Circuit Judge and WYCHE and TIMMERMAN, District Judges.

WYCHE, District Judge.

This is a suit to enjoin the enforcement of a South Carolina statute (Appendix A) which, among other things, declares it to be unlawful, punishable by fine and imprisonment in the discretion of the Court, (1) for any insurance company to own a mortuary or to permit its officers or employees to operate a mortuary, and (2) for any funeral director or employee of a

mortuary to be licensed as an insurance agent, upon the ground that it is violative of the Federal Constitution.

With the filing of the action, plaintiffs applied for the convening of a statutory Court to hear and determine their application for an interlocutory injunction, and pending such hearing, for a temporary restraining order. Section 266 of the Judicial Code, 28 U.S.C.A. § 380. On April 17, 1948, an order was entered, convening such statutory Court, and granting a ten day temporary restraining order, which has been continued by agreement of the parties.

The hearing before the statutory Court was based upon the pleadings, stipulations and various affidavits submitted by the parties. It was agreed by counsel for all the parties that, after ruling out all incompetent matter, the cause be submitted for a final decree upon the merits.

[redacted] It is clear from the pleadings and the record that federal and equity jurisdiction exists, and that if the Act be unconstitutional, as claimed, plaintiffs are entitled to the relief prayed. Dobie on Federal Procedure, 166; Liggett Co. v. Baldridge, 1928, 278 U.S. 105, 110, 49 S.Ct. 57, 73 L.Ed. 204; Terrace v. Thompson, 1923, 263 U.S. 197, 215, 44 S.Ct. 15, 68 L.Ed. 255. The question in this case is whether the challenged act contravenes the due process and equal protection clauses of the Federal Constitution. Amendment 14.

The facts giving rise to the controversy, briefly summarized, are as follows: For a number of years insurance companies, primarily those engaged in the issuance of what is commonly designated as "industrial insurance," have been selling in South Carolina a type of insurance policy which assures the payment of the assured's funeral upon his death. The record shows that in one instance at least (and the record does not indicate whether this case is instanced as an isolated example or as illustrative of a common practice) the agent of the insurance company selling this type of insurance, was an employee of a mortuary. So far as the record shows, no improper advantages of any kind were taken of the assured, either as a result of the issuance of this type of insurance, or of the fact that an agent selling it was connected with a mortuary.

In the early part of 1948, the plaintiff Family Security Life Insurance Company, a legal-reserve life insurance corporation, organized under the laws of South Carolina, embarked aggressively upon the business of writing this "pre-paid funeral" type of insurance. The active promoters of the company were J. Gordon Floyd and A. G. Mackey, both funeral directors, one located in Spartanburg and the other in Greenville, South Carolina. One of the reasons for Floyd's and Mackey's interest was their natural desire to see that as many persons as possible had assured the payment of their funeral through insurance. One of the heavy expense items in a mortuary, especially in the South, is the large volume of "charity funerals." By energetically pushing this type of insurance, Floyd and Mackey, both for themselves and for other morticians, would be protecting themselves, to a degree, against the loss attaching to "charity funerals."

The officers and employees of other mortuaries in the State were actively solicited as stockholders and agents of this insurance company. A large number associated themselves with the company as stockholders and/or agents. The company made rapid strides immediately. To a degree this resulted from the more liberal provisions incorporated in this plaintiff company's policies.

All policies offered by the company are on a life insurance basis with legal reserves and non-forfeiture values approved by the South Carolina Insurance Commissioner; and claims paid on the company's policies of insurance are made in cash, and permits the beneficiary freedom of choice in selection of a funeral home and in selection of type and cost of merchandise and services. Its contracts are more favorable to the insured than those of other competing companies writing the same class of insurance because of higher policyholders' reserves, more favorable premium rates, more liberal extended insurance and cash surrender values, and the adoption of the 1941 Standard Industrial Mortality Table. And it,

alone, of all South Carolina companies, writes insurance up to age 74, and is the only industrial insurance company in South Carolina that has adopted the recommended provisions of the Guertin Reports. (Appendix B)

The plaintiff insurance company has 34 stockholders, all of whom except one, either own, manage, supervise, operate or are employed by a mortuary, or undertaking establishment. It has 79 agents, all duly licensed by the Insurance Commissioner of South Carolina, 51 of whom are funeral directors, or owners, employees, or agents or officers of mortuaries, funeral directors, or undertaking establishments. No one funeral home may own more than forty-nine per cent of the company's outstanding stock. Its President and all but one of its five Directors are either owners, managers, supervisors, or operators of mortuaries or undertaking establishments. It grants no exclusive agency in any community; anyone, including those in or entering into the undertaking business can become an agent and become a stockholder in the plaintiff company.

In 1947, before the plaintiff company became active, the insurance laws of South Carolina were drastically revised under an Act known as "The Insurance Law." Act May 12, 1947, 45 Stat. of S.C. pp. 322-473. These revisions were designed to, and did invest the Insurance Commissioner of South Carolina with the broadest and most extensive powers of supervision and control over insurance companies and insurance agents operating in South Carolina. Under "The Insurance Law", an insurance company can only be authorized to operate in South Carolina if the Insurance Commissioner approves its charter, and no agent can be licensed until the Commissioner has determined upon application and examination that the applicant is "a competent and trustworthy person" to act as such agent. This law clothes the Commissioner with authority to correct any form of "unfair competition" found by him to be employed by any insurance company. It also, makes it a criminal offense, punishable by fine and imprisonment in the discretion of the Court "to make payment or settlement of death benefits * * * in merchandise or services rendered or agreed to be rendered." The Insurance Commissioner is empowered to revoke licenses of companies for proper cause or for violation of the laws of this State, to revoke the license of an agent when it appears that an agent has violated the law or *wilfully deceived or unjustly dealt with the citizens* of the State. In short "The Insurance Law" gives the Commissioner plenary authority to deny or revoke licenses to any company or agent whose operations or activities might be deemed as a violation of law, unfair, unjust or deceptive.

Before the enactment of the challenged statute, and after an investigation of the proposed operations of the plaintiff company the Insurance Commissioner of the State, acting under "The Insurance Law" had duly authorized it to engage in the writing of its type of "burial insurance" through funeral directors and employees of mortuaries, generally, as agents. Prior to this approval being given, the South Carolina Insurance Commissioner, it appears from the undisputed record, carefully inquired into plaintiff company's proposed method of operating and especially its intention to use normally funeral directors and employees of mortuaries as its agents. Such administrative officer, charged with special knowledge and familiarity in the field of insurance and clothed with such extensive powers, was not required to approve the operations of an insurance company if those operations transgressed the insurance laws of South Carolina, were unfair as against policyholders or competing companies, or might be subject to deception or improper advantage. By approving the plaintiff company's operations, the Insurance Commissioner had necessarily to conclude that those operations were proper. Similarly, the Insurance Commissioner duly licensed all the agents of plaintiff company, including the individual plaintiff Lanford, most of whom were employees of mortuaries. In so doing, the Commissioner found that such persons were both "competent" and "trustworthy" in every particular.

As the business of the plaintiff company increased rapidly its competitors became active. At meetings of agents of the com-

peting insurance companies, pressure for legislation to destroy plaintiff company and to proscribe its agents was agreed upon. Division developed, too, among the morticians themselves and some of them joined with the competing insurance companies in promoting special legislation intended to destroy plaintiff company and its business. It seems obvious from the record that this legislation had its genesis in the desire of the existing insurance companies to eliminate the plaintiff company as a competitor. As a result of this pressure, the Legislature of South Carolina enacted, and the Governor approved on April 14, 1948, the challenged statute. (Appendix A)

Obviously, this statute foreclosed plaintiff Lanford from pursuing further his established insurance business, simply because he was also employed by a mortuary. It likewise made it impossible for plaintiff company to have funeral directors and employees of mortuaries licensed as its agents, though this was its established method of operation, which had been approved by the Insurance Commissioner. Because the statute hit so patently at plaintiff company and its agents and limited their operations, the plaintiff company and the plaintiff Lanford, suing on behalf of himself and all others similarly situated, promptly filed in this Court their action to enjoin the enforcement of the statute.

 The applicable principles of constitutional law are well settled. While the legislative power to regulate insurance is undisputed and although every presumption in favor of the legality of the legislation may be indulged, neither of these principles will justify any arbitrary legislative interference with the right of an individual to follow a lawful vocation such as an insurance agent. Any legislative restriction upon such right of a citizen must have some rational basis and must be reasonably designed to protect against some recognizable evil. To be specific, when the legislation questioned in this proceeding would deny to any employee of a mortuary the right to follow the lawful vocation of an insurance agent for no reason other than his employment by the mortuary, it is essential, if such legislation is to withstand the attack upon its constitutionality, to show that

there is some connection between the legislative prohibition and an evil arising out of the employment of such employee as an insurance agent.

In Burns Baking Co. v. Bryan, 264 U.S. 504, at page 513, 44 S.Ct. 412, 413, 68 L.Ed. 813, 32 A.L.R. 661, the Court said: "* * * a state may not, under the guise of protecting the public, *arbitrarily interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them.*" (Emphasis added.)

In discussing the Fourteenth Amendment and its guaranties, the Court in Meyer v. Nebraska, 262 U.S. 390, at pages 399, 400, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 29 A.L.R. 1446, said: "While this court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men. * * * The established doctrine is that this liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect. *Determination by the Legislature of what constitutes proper exercise of police power is not final or conclusive but is subject to supervision by the courts.*" (Emphasis added.)

 The statute in question would deny to any officer of an insurance company the right to own an interest in a mortuary and, more importantly, would make it a crime for an employee of a mortuary, whatever the character of his employment, whether part-time or full-time, whether as occasional driver or as general manager, to sell life insurance. This statute has no saving separability clause of constitutionality. In view of the modern form of legislative

drafting, the omission of such a provision evidences clearly the legislative intent that this statute must stand or fall as a whole. Carter v. Carter Coal Co., 298 U.S. 238, at page 312, 56 S.Ct. 855, 80 L.Ed. 1160. If either limitation imposed upon the right of freedom of contract is invalid, the entire statute must fall. Certainly, that portion which makes it illegal per se for an employee of a mortuary to write insurance too transgresses the constitutional restraint upon legislative action.

This legislation carries on its face no evidence of the evil sought thereby to be thwarted by the proscription of employees of undertakers as insurance agents. In their answer, their competent affidavits, or their argument, the defendants have referred to no real facts justifying the proscription. Their argument is silent of any reasonable basis for this limitation upon the right of employment by a citizen. There is nothing to show that the interest of the public generally, as distinguished from other industrial insurance companies, requires such interference.

How can this Court, however much it may indulge its fancy, find any rational basis for this restriction upon the right of an individual citizen? The undisputed record in this case shows that prior to the enactment of this legislation one of the individual plaintiffs, an employee of a mortuary, had been duly licensed as an insurance agent by the Insurance Commissioner of South Carolina to write insurance for two other life insurance companies. It matters not under the assailed statute whether he merely drives an ambulance part-time or acts as a part-time usher, this statute declares his employment as an insurance agent as criminal. Yet, under "The Insurance Law" of South Carolina no one can be licensed as an insurance agent until the Insurance Commissioner has examined him, made due investigation and inquiry, and has satisfied himself that the agent is of sufficient moral character and sufficiently qualified to be authorized to act as an agent. By this same law the Insurance Commissioner is empowered, if any agent licensed by him should conduct himself improperly, violate the law, wilfully deceive, or unjustly deal with citizens of the State, to revoke the license theretofore issued. The plaintiff agent was issued a license by the Insurance Commissioner after such investigation and examination. This license was renewed only a few weeks prior to the enactment of this legislation. The Insurance Commissioner of the State has taken no steps to revoke his license. Nonetheless, in the absence of any showing that such agent is incompetent to act as an insurance agent and in the face of the positive finding by the Insurance Commissioner of the State that he is so qualified, the legislature has attempted by this challenged act to deprive him of the right to continue to act as an insurance agent in accordance with the authorization given to him by the Insurance Commissioner of South Carolina for the simple and only reason that he is employed also by a mortuary. Under such circumstances the conclusion, it appears to us, is inescapable that the legislative prohibition is an arbitrary exercise of the legislative power violative of the constitutional rights of the individual plaintiff.

Defendants' main contention in their arguments addresses itself to that portion of the assailed statute which denies to a mortuary and a funeral director the right to be licensed as an insurance agent, but it is equally clear to us that the reasoning employed to support this legislative prohibition is similarly untenable. In their arguments they attempted to give some coloring of reason to this arbitrary legislation. Thus they have suggested that if an undertaker or funeral director or mortuary is licensed as an agent for an insurance company and actively aids in the development of its business, there will be some temptation to charge for the funeral the full amount of the insurance, even where the insured is a person of very scant means. Such argument overlooks the fact that this insurance is procured for the purpose of assuring an adequate funeral for the assured. The assured has himself fixed the amount of that insurance and has thereby determined the amount which he wishes invested in his funeral. Since the assured took out the insurance and paid the premiums, his wish that the full amount of insurance should be used for his funeral rep-

resents, it would seem, a trust which his family would conscientiously carry out.

It is also asserted by the defendants that this portion of the challenged statute is intended to circumvent any subtle evasion of the existing statutory law prohibiting the payment of life insurance policies in merchandise or services. The policy and the by-laws of the plaintiff company provide that it shall be payable in cash. That is an enforceable right. The "Insurance Law" requires the amount of the policy to be paid in cash. We cannot assume that the plaintiff company and its agents will violate the criminal law. No one has suggested that there has been the slightest attempt at evasion of this provision of the contract. The theory upon which this argument is predicated is that the "facility of payment" clause would justify the insurer in paying the proceeds of the policy to the undertaker conducting the funeral. The language of the clause does not support this conclusion. But it is true that the proceeds of the insurance will likely be used to pay for a funeral. This is the purpose of the insurance. The assured was seeking thereby to guarantee the payment of his funeral. If the beneficiary of the policy does not provide a funeral for the assured with the proceeds of the insurance, he will, as we have already pointed out, be violating at least a moral duty to the deceased.

Furthermore, during the legislative hearings preceding the enactment of the statute in question, it was freely conceded by the proponents of the legislation that they knew of no instance when any advantage of any kind had been taken of any assured, or of any complaint as a result of the operations of the plaintiff company, of the issuance of its type of insurance, or of the fact that morticians or their employees acted as agents for an insurance company.

Moreover, if the plaintiff company's method of operating was of a character to facilitate the evasion of existing insurance laws, such as that prohibiting settlement of the policy in merchandise and services (a conclusion that has no plausibility in the face of the admitted fact that the plaintiff Floyd was one of the active promoters of this provision, and was instrumental in obtaining its incorporation in "The Insurance Law"), the Insurance Commissioner was authorized under existing law to deny the plaintiff company the right to operate and to deny to its agents licenses. His failure so to do is cogent proof that this argument of the defendants is without any merit.

It is also stated that Mr. Floyd in his campaign to secure undertakers as agents for his company stated that this insurance would be a means of confining the undertaking business in South Carolina to the undertakers who are Floyd's agents and that it would be a means of discouraging new competitors, especially veterans, from embarking upon this business. The undisputed facts in this case refute this suggestion. The plaintiff insurance company grants no exclusive agency in any community. Anyone entering the undertaking business can become an agent and become a stockholder in the plaintiff company. This applies to veterans and everyone else alike. This insurance cannot, therefore, be used as a device for maintaining the business status quo or closing the door to any new competitor all of whom have equal rights with their older competitors to utilize this service. Further, it must be remembered that the plaintiff company has no copyright on this type of insurance. Already, many other insurance companies write it. For many years many of the smaller life insurance companies have been engaged in writing this type of insurance almost exclusively, and many of the larger companies have an "Industrial Department" for writing this type of insurance. If an undertaker does not wish to represent the plaintiff company, there are many competitors of the plaintiff company whom he can represent.

It is said that the undertaker insurance agent receives a modest commission of only 15% and that this remuneration is so small that the agent will be tempted to secure his remuneration elsewhere. Why 15% is not adequate compensation the defendants do not show. Certainly if the agent secures a sufficient volume of business this rate of commission should provide an adequate return. In any event, it seems impossible to support a statute of such an arbitrary na-

ture as the challenged act on this novel ground.

Actually, it seems obvious from the record that this legislation had its genesis in the desire of the existing insurance companies to eliminate the plaintiff company as a competitor. This language of the Court in People v. Gillson, 109 N.Y. 389, 17 N.E. 343, at pages 345, 346, 4 Am.St.Rep. 465, seems apt: "Liberty, in its broad sense, as understood in this country, means the right, not only of freedom from servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation. These principles are contained and stated in the above language in various cases * * * (citing cases). It is quite clear that some or all of these fundamental and valuable rights are invaded, weakened, limited, or destroyed by the legislation under consideration. *It is evidently of that kind which has been so frequent of late,—a kind which is meant to protect some class in the community against the fair, free, and full competition of some other class; the members of the former class thinking it impossible to hold their own against such competition, and therefore flying to the legislature to secure some enactment which shall operate favorably to them, or unfavorably to their competitors, in the commercial, agricultural, manufacturing, or producing fields."* (Emphasis added.)

The reasoning of the Supreme Court in Liggett Co. v. Baldridge, supra [278 U.S. 105, 110, 49 S.Ct. 59], seems conclusive against the validity of the instant statute. In the cited case a Pennsylvania statute required every drug store to be owned by a licensed pharmacist, and forbade any corporation, association or partnership to own a drug store unless all the partners or members were licensed pharmacists. In striking down such legislation as unconstitutional the Court said: "A state undoubtedly may regulate the prescription, compounding of prescriptions, purchase and sale of medicines, by appropriate legislation to the extent reasonably necessary to protect the public health. And this the Pennsylvania Legislature sought to do by

various statutory provisions in force long before the enactment of the statute under review." After reciting the regulatory legislation of Pennsylvania protecting the public health in relation to the compounding and sale of prescriptions and medicines the Court concluded: "Thus, it would seem, every point at which the public health is likely to be injuriously affected by the act of the owner in buying, compounding, or selling drugs and medicines is amply safeguarded." Likewise, it may be said with equal force, in applying the same reasoning, here, that a state undoubtedly may regulate the insurance business and the licensing of insurance companies and insurance agents, and the revocation of such licenses, and this, South Carolina sought to do, by the enactment of "The Insurance Law", before the enactment of the statute under consideration. Thus, it would seem, every point at which defendants contend that the public health, safety, morals or general welfare is likely to be injuriously affected by the licensing of funeral directors or employees of mortuaries as insurance agents is amply safeguarded by "The Insurance Law." In holding the statute invalid in the Liggett Case, the Supreme Court concluded: "The act under review * * * deals in terms only with ownership. It plainly forbids the exercise of an ordinary property right and, on its face, denies what the Constitution guarantees. A state cannot, 'under the guise of protecting the public, arbitrarily interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them.'"

In fact, the defendants assume that the Liggett Case, if followed by this Court, would require the granting of plaintiffs' prayer. However, they point to Mr. Justice Holmes' dissent and assert that we should conclude that the present constituency of the Supreme Court will follow the dissenting opinion of Mr. Justice Holmes rather than the majority opinion of the Court. We cannot agree to the view that lower courts may review the decisions of the Supreme Court, and, following the predilection for individual justices, subvert the salutary doctrine of stare decisis into a study of personalities rather than a be-

coming observance of the accepted majority decisions of the Supreme Court. We are firmly of the opinion that if the decisions of the Supreme Court are to be reversed, that function should be reserved to the Supreme Court itself. Any other rule would bog down the judicial processes hopelessly in those quagmires of uncertainty which would justly lay the District Courts open to the gravest public censure. It is not our duty to speculate on what the Supreme Court as now constituted may do on an appeal in this case. It is our duty to decide the case as we think it ought to be decided on the decisions as they now stand.

Hauser v. North British & Mercantile Ins. Co., 206 N.Y. 455, 100 N.E. 52, 53, 42 L.R.A.,N.S., 1139, Ann.Cas.1914B, 263, is also in point and its reasoning is aptly applicable to the case we have for decision. In that case the Court said:

"As it was intimated below, following the suggestion in People v. Ringe, 197 N.Y. 143, 90 N.E. 451, 27 L.R.A.,N.S., 528, 18 Ann.Cas. 474, the legislation, now in question, must have been promoted in the interests of those engaged in the insurance brokerage business, alone, or in connection with a real estate brokerage business, rather than with any view of the public welfare. And see People v. Gillson, 109 N.Y. 389, at page 399, 17 N.E. 343, 4 Am. St.Rep. 465. Why should those who wish to engage in the business of soliciting and placing insurance not be permitted to conduct it as incidental to, or in connection with, any other innocent occupation, except that of real estate brokers? Where the Legislature may prohibit a business, or an occupation, it may prescribe conditions upon which it may be conducted; but, if the business, or occupation, be useful to the citizen, and it be lawful, the Constitution, both of the state and of the nation, guarantees to him the right to pursue it freely, and any arbitrary restriction upon its pursuit should be condemned as an invasion of the guaranty. In varying language, but with the same thought, in very many cases, this court has pointed out that the constitutionality of an act is to be tested by its effect upon the citizen's right freely to pursue lawful occupations; that

a statute under the guise of an exercise of the police power cannot arbitrarily interfere with that liberty of pursuit; that the equal protection of the laws means equality of opportunity to all in like circumstances; and that classification to be valid must not be arbitrary and discriminate against persons without a basis in reason. These principles have become familiar from frequent statement in the decisions and need no citation, nor discussion, of the cases here. They have become constituent elements in our popular form of government. The very nature of our free government forbids that a man should be compelled to refrain from acts which the laws permit.

"The statute before us goes far beyond what is proper regulation and is prohibitory, in preventing a person from pursuing the occupation of an insurance broker, except as his principal business, or as an adjunct to a real estate business. To use the language in the case of Wynehamer v. People, 13 N.Y. [378], at page 399, this statute 'passes the utmost limit of regulation, and does not even wear a disguise.' The restriction is not in the public interests; it is obviously in the interests of the class, either of insurance, or of real estate, brokers. The insurance underwriters are not forbidden to transact their business through brokers; they are required to limit it to the class of brokers authorized by the statute. The plaintiff is a lawyer, and presumably the nature of that occupation should well qualify him to make insurance contracts, and there are many mercantile occupations, which certainly cannot be deemed to affect the person's fitness to solicit, or to place, insurance. But this statute would prevent them from adding to their earnings by pursuing that occupation. To concede the validity of this statute would be to concede a power to the Legislature in the guise of a regulation to destroy a lawful business. This plaintiff had built up a brokerage business, in connection with his other occupation—as many, presumably, others have done holding, similarly, fire exchange brokers' certificates. But, under this statute, he is compelled to refrain from it, unless pursued under conditions which involve the sacrifice

of that other occupation. Arbitrarily, the statute interferes with a citizen's business pursuits and, by an unreasonable discrimination, deprives him of that equal opportunity, which the Constitution guarantees to him. What is there in the calling of an insurance agent, or broker, which demands any especial training, or knowledge, not readily to be acquired by any business man? That he should be qualified by antecedents and in character for engaging in an occupation calling for some degree of trustworthiness may be true; as it is, also, true that the nature of this occupation, differing from other mercantile pursuits, calls for an acquaintance with certain rules by which it is governed. But trustworthiness is the common property of men, and success in placing insurance will depend upon the industry, honesty, and competency, which the broker displays."

The challenged statute affects no other insurance company than the plaintiff insurance company, nor the agents of any insurance company other than the agents of the plaintiff company. As heretofore pointed out, it would deny to any insurance company, and an officer of an insurance company, the right to own an interest in, or operate a mortuary, and would deny to an undertaker, or an employee of an undertaker, the right to be licensed as an insurance agent. One of counsel for defendants frankly admitted in open court that he knew of no insurance company, or of any officer or agent of any insurance company, who desired to go into the undertaking business.

The challenged statute forecloses plaintiff Lanford from pursuing further his established insurance business, simply because he is also employed by a mortuary; it likewise makes it impossible for plaintiff insurance company to have undertakers and employees of mortuaries licensed as its agents, though this was its established method of operation; it is arbitrary and discriminative and designed to destroy, and will destroy, the plaintiff insurance company and its business, and deprive it and its agents of the right to do business in a lawful manner, and pursue a necessary, useful, and lawful gainful calling, with no discernible public evil to be corrected, or public benefit to be achieved; and for these reasons it violates the due process and equal protection clauses of the United States Constitution.

For the reasons herein stated it is our opinion that the injunctive relief prayed for should be granted. A judgment to this effect will be filed herewith.

### Appendix A

"An Act making it unlawful for any life insurance company, its officers, agents or employees to own, operate or maintain a funeral or undertaking business; or contract, or agree with any funeral or undertaking establishment to conduct the funeral of any person insured by such insurance company; or for any funeral or undertaking establishment, its agents, officers, or employees to be licensed as agent, salesman or solicitor for any life insurance company doing business in this state.

"Be it enacted by the General Assembly of the State of South Carolina:

"Section 1. It shall be unlawful for any life insurance company, corporation, or association, except fraternal benefit societies licensed to do business in this State to own, manage, supervise, or operate or maintain a mortuary or undertaking establishment, or to permit its officers, agents, or employees to own, operate, or maintain any such funeral or undertaking business.

"Section 2. It shall be unlawful for any life insurance company, sick or funeral benefit company, or any company, corporation or association engaged in a similar business to contract or agree with any funeral director, undertaker or mortuary to the effect that such funeral director, undertaker, or mortuary shall conduct the funeral of any person insured by such company, corporation or association.

"Section 3. It shall be unlawful for any funeral director, undertaker, or mortuary, or any agent, officer or employee thereof to be licensed as agent, solicitor or salesman for any life insurance company, corporation or association doing business in this State.

"Section 4. Any person violating any of the provisions of this Act shall be deemed guilty of a misdemeanor, and each viola-

tion thereof shall be a separate offense, and upon conviction shall be punished by fine not exceeding One Thousand ($1,000.-00) Dollars or by imprisonment at hard labor for not exceeding six (6) months, or both such fine and imprisonment within the discretion of the Courts.

"Section 5. All Acts or parts of Acts inconsistent with this Act are hereby repealed.

"Section 6. This Act shall take effect upon its approval by the Governor.

"Approved the 14 day of April, 1948."

### Appendix B

In 1937 the President of the National Association of Insurance Commissioners appointed a committee composed of the actuaries of the Insurance Departments of five different States with one representative each from the Actuarial Society of America, and the American Institute of Actuaries, to study and report upon the need for a new mortality table, because of "the apparently enormous profits accruing to insurance companies from the so-called 'gain from mortality'", as he phrased it. The report, outlining the scope of its investigations in detail, and presenting the committee's conclusions and recommendations, supported by elaborate and detailed scientific analyses, graphs, charts, statistical tables, comparisons of methods of valuation, and a digest of the statutory provisions of various states was adopted by the Association at its meeting at Biloxi, Mississippi, December 8, 1939. The report recommended legislation which it "deemed in the public interest, because of its encouragement to strengthening of reserve bases in accordance with modern tables of mortality, lower rates of interest, and more conservative methods of calculation". In June, 1941, the report specifically recommended legislation revising the artificial relationship between mortality and interest standards, liberalized cash surrender values, and extended insurance provisions, and the adoption of the "1941 Standard Industrial Mortality Table" and discarding the "American Experience Mortality Table", widely in use, especially in the South, and used by all insurance companies writing industrial life insurance in South Carolina *except the plaintiff insurance company,*

unrevised since 1870, and necessarily failing to reflect the immense gains in life expectancy brought about by the many discoveries and scientific advances in the medical and surgical realm, as well as the discovery and development of the so-called "magic drugs", and the new methods of treatment, and the quicker hospital and medical relief made possible by the immense improvements in transportation. These reports are known in the terminology of insurance men as "The Guertin Reports."

DOBIE, Circuit Judge (dissenting).

I think the South Carolina Statute is constitutional, so it would seem proper for me to state briefly the reasons that compel me to reach this conclusion.

Certain principles favoring this view are so well established as to require little need of citations. The police power of the State is very broad and especially is this true when, as here, the subject matter of a statute, namely insurance, is a matter of public interest. And it has also been held that the undertaking business is one of public concern. Walton v. Commonwealth, 187 Va. 275, 46 S.E.2d 373; State v. Blackwell, 196 S.C. 313, 13 S.E.2d 433. There is a primary presumption of the constitutionality of a State statute in the light of the Federal Constitution and a strong showing must be made by the party attacking the constitutionality of the statute. Where the business is one of public concern and the State legislature, on any reasonable ground, thinks that an evil exists which ought to be remedied, and where the legislative remedy has any rational relation to this evil, the statute is valid. Only where the statute is quite arbitrary or capricious and utterly unreasonable, should the courts strike the statute down as unconstitutional. See 16 C. J.S., Constitutional Law, §§ 174, 668; 11 Am.Jur., Commerce, § 94, Const.Law, §§ 255, 284, 303, 305; 12 Am.Jur., Const.Law, §§ 567, 575, 655. See also, Fitzpatrick v. Liquor Control Commission, 316 Mich. 83, 25 N.W.2d 118 (upholding a State statute forbidding the employment of women as bartenders); Dufour v. Maize, 358 Pa. 309, 56 A.2d 675 (upholding Pennsylvania Bi-

tuminous Coal Open Pit Mining Act, 52 P.S. § 1396.1 et seq.); United States v. Southeastern Underwriters, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440; Merchants' Mut. Automobile Liability Co. v. Smart, 267 U.S. 126, 45 S.Ct. 320, 69 L.Ed. 538.

In the very important case of Osborn v. Ozlin, 310 U.S. 53, 65, 66, 60 S.Ct. 758, 762, 84 L.Ed. 1074, Mr. Justice Frankfurter stated:

"It is not our province to measure the social advantages to Virginia of regulating the conduct of insurance companies within her borders insofar as it affects Virginia risks. Government has always had a special relation to insurance. The ways of safeguarding against the untoward manifestations of nature and other vicissitudes of life have long been withdrawn from the benefits and caprices of free competition. The state may fix insurance rates, German Alliance Ins. Co. v. Lewis, 233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011, L.R.A.1915C, 1189, it may regulate the compensation of agents, O'Gorman & Young v. Hartford Fire Ins. Co., 282 U.S. 251, 51 S.Ct. 130, 75 L.Ed. 324, 72 A.L.R. 1163, it may curtail drastically the area of free contract, National Union Fire Ins. Co. v. Wanberg, 260 U.S. 71, 43 S.Ct. 32, 67 L.Ed. 136. States have controlled the expenses of insurance companies, New York Insurance Law, Consolidated Laws of New York, c. 28, § 244, and Wisconsin Statutes, § 201.21; and see Report of Joint (Armstrong) Insurance Investigation Committee (N.Y.) pp. 403–18 (1906). They have also promoted insurance through savings banks; see Berman, The Massachusetts System of Savings Bank Life Insurance, Bulletin No. 615, U. S. Bureau of Labor Statistics, and New York Laws of 1938, c. 471. In the light of all these exertions of state power it does not seem possible to doubt that the state could, if it chose, go into the insurance business, just as it can operate warehouses, flour mills, and other business ventures, Green v. Frazier, 253 U.S. 233, 40 S.Ct. 499, 64 L.Ed. 878, or might take 'the whole business of banking under its control,' Noble State Bank v. Haskell, 219 U.S. 104, 113, 31 S.Ct. 186, 188, 55 L.Ed. 112, 32 L.R.A.,N.S., 1062, Ann.Cas.1912A, 487. If the state, as to local risks, could thus preempt the field of insurance for itself, it may stay its intervention short of such a drastic step by insisting that its own residents shall have a share in devising and safeguarding protection against its local hazards. La Tourette v. McMaster, 248 U.S. 465, 39 S.Ct. 160, 63 L.Ed. 362. All these are questions of policy not for us to judge. For it can never be emphasized too much that one's own opinion as to the wisdom of a law must be wholly excluded when one is doing one's judicial duty. The limit of our inquiry is reached when we conclude that Virginia has exerted its powers as to matters within the bounds of her control."

And, in La Tourette v. McMaster, 248 U.S. 465, 467, 468, 39 S.Ct. 160, 161, 63 L.Ed. 362, Mr. Justice McKenna observed:

"This contention depends upon the character of the business of insurance, and it was decided in German Alliance Insurance Co. v. Lewis, 233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011, L.R.A.1916C, 1189, to be clothed with a public interest and subject, therefore, to the regulating power of the state. And it necessarily follows that, as insurance is affected with a public interest, those engaged in it or who bring about its consummation are affected with the same interest and subject to regulation as it is. A broker is so engaged—is an instrument of such consummation. The statute makes him the representative of the insured. He is also the representative of the insurer (Hooper v. California, 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297), and his fidelity to both may be the concern of the state to secure. As said by the Supreme Court of the state (104 S.C. 501, 89 S.E. 398): 'It is important for the protection of the interests of the people of the state that the business should be in the hands of competent and trustworthy persons.' And we may say that this result can be more confidently and completely secured through resident brokers, they being immediately under the inspection of the commissioner of insurance. The motive of the statute, therefore, is benefit to insurer and insured and the means it provides seem to be appropriate.

" 'But we need not cast about for reasons for the legislative judgment. We are not required to be sure of the precise rea-

sons for its exercise or be convinced of the wisdom of its exercise.' It is enough if the legislation be passed in the exercise of a power of government and has relation to that power. Rast v. Van Deman & Lewis Co., 240 U.S. 342, 365, 366, 36 S.Ct. 370, 60 L.Ed. 679, L.R.A.1917A, 421, Ann.Cas. 1917P, 455, and cases cited; also Bunting v. Oregon, 243 U.S. 426, 437, 37 S.Ct. 435, 61 L.Ed. 830, Ann.Cas.1918A, 1043."

It seems to me that there is a very real evil in the case before us. A South Carolina statute prohibits the payment of life insurance policies in either services or merchandise. Code 1942, § 7984, 36 Stat. 234. Plaintiffs here make much of the fact that the policy is payable to a stated beneficiary and there is no contractual obligation requiring that the undertaker who was the agent writing the policy must take care of the funeral. It is very significant, though, that the policy is enclosed in a jacket-envelope. On this jacket-envelope is printed in large red capital letters: "Guaranteed Protection For Prepayment of Funeral Expenses of" followed by a blank for the name of the insured. When the policy is written, as will usually be the case, by an undertaker, the name of this undertaker will be typewritten on this jacket-envelope with a statement that the premium payments are due each month and payable to the undertaker. At the bottom of this jacket-envelope is also printed in large capitals: "The Family Security Life Insurance Company is Owned and Operated by South Carolina Funeral Directors For the People of South Carolina." Then, on the face of the policy is a "Facility of Payment" Clause which would clearly justify the insurer in paying the proceeds of the policy to the undertaker conducting the funeral. I therefore think that the constitutionality of the statute could be sustained solely on the ground that in actual practice the statute plugs up a loop-hole and prevents a subtle evasion of the South Carolina law prohibiting the payment of life insurance policies in merchandise or services.

It has been held in a number of cases that a life insurance agent, in certain aspects, acts for both parties—the insurer and the insured, and we know that life insurance companies are stressing the role of the agent as a counselor to the insured. La Tourette v. McMaster, 248 U.S. 465, 467, 468, 39 S.Ct. 160, 63 L.Ed. 362. There are many situations in our case which would place the insurer-undertaker in a rather parlous position. If the undertaker who writes the policy secures the funeral, it then becomes to the interest of the undertaker-agent to have the policy paid in full. If, on the other hand, the funeral is to be conducted by some other undertaker, or this is even contemplated, the undertaker-agent has a club to compel his securing the funeral.

There is evidence in the affidavits that Mr. Floyd, in his compaign to secure undertakers as agents for his Company, stated that this insurance would be a means of confining the undertaking business in South Carolina to the undertakers who are Floyd's agents and that it would be used as a means of discouraging other men, particularly veterans, from embarking upon this business. There was also evidence in some of the affidavits that such a result had been brought about in some of the far Southern States.

The undertaker-insurance agent receives for his services in collecting the premiums 15%. Since these amounts are very small, this is a trifling consideration and the undertaker-agent is tempted to secure his real remuneration out of conducting the funeral. In one specimen policy, the monthly payment premium is $1.57 so that the undertaker-agent would receive less than twenty-five cents a month for collecting these premiums.

The undertaker-agent writing the policy knows, of course, the amount of the insurance. This affords him a strong temptation to charge for the funeral the full amount of the insurance, even where the insured is a person of very scant means. We must notice, too, that these policies will be written in small amounts for people of little economic substance and probably less intelligence, who will be putty in the hands of a strong and forceful insurer-undertaker.

There seems to me to be little merit in the suggestion of the plaintiffs that this is the only Company now engaged in this

type of business in South Carolina. If these plaintiffs are successful, and if the Company writes many policies, as it seems to have done, other companies will undoubtedly be attracted to this field.

The statute is couched in general terms and applies to all undertakers or life insurance companies and their agents. If a State has the right to regulate race tracks, certainly a statute directed at all race tracks would not be invalid merely by virtue of the fact that at the time of the enactment of the statute, there was only one race track within the State.

The two cases cited by the plaintiffs most clearly in point were unduly restrictive. In Hauser v. North British & Mercantile Insurance Co., 206 N.Y. 455, 100 N.E. 52, 42 L.R.A.,N.S., 1139, Ann.Cas. 1914B, 263, the statute limited the insurance business solely to those principally engaged in that business and to real estate agents. All others, however well-qualified, were barred. In Northwestern Nat. Insurance Co. v. Fishback, 130 Wash. 490, 228 P. 516, 36 A.L.R. 1507, the statute limited the insurance company to one agent in cities of less than 50,000 inhabitants and to two agents in cities of over 50,000, however great might be the actual need of additional agents. Cf. Liggett Co. v. Baldridge, 278 U.S. 105, 49 S.Ct. 57, 73 L.Ed. 204; Tyson & Bro. United Theatre Ticket Offices v. Banton, 273 U.S. 418, 47 S.Ct. 426, 71 L.Ed. 718, 58 A.L.R. 1236; Lakeland Highlands Canning Co. v. Mayo, D.C., 28 F.Supp. 44, 46. In our case, the statute leaves the field of insurance wide-open, with the exception of undertakers, and for the reasons that I have stated, it seems to me that the undertaking business and the life insurance business, like oil and water, do not mix.

There has been a decided swing in the viewpoint of the United States Supreme Court in this field. Formerly, the Court seemed willing to strike down State statutes on the score that these statutes contravened the Fourteenth Amendment. The dissenting opinions of Holmes and Brandeis in the earlier cases have now been quite generally upheld. Said Mr. Justice Holmes, in his dissenting opinion in Liggett Co. v. Baldridge, 278 U.S. 105, 115, 49 S.Ct. 57, 60, 73 L.Ed. 204: "The Constitution does not make it a condition of preventive legislation that it should work a perfect cure. It is enough if the questioned act has a manifest tendency to cure or at least to make the evil less." The modern cases have stressed the idea that questions of policy are for the legislature and not for the courts, and that courts cannot strike down a statute merely because they think the statute is unwise or because it is not the best remedy for the apparent evil. These cases give wide latitude to State legislatures for experimental legislation in economic and social fields. Powell v. Pennsylvania, 127 U.S. 678, 8 S.Ct. 992, 32 L.Ed. 253; Carolene Products v. United States, 323 U.S. 18, 65 S.Ct. 1, 89 L.Ed. 15, 155 A.L.R. 1371; Sage Stores v. Kansas, 323 U.S. 32, 65 S.Ct. 9, 89 L.Ed. 25. Particularly ample is this power to protect a person deemed by the legislature (as here) to be the weaker of the contracting parties. See Advance-Rumely Thresher Co. v. Jackson, 287 U.S. 283, 53 S.Ct. 133, 77 L.Ed. 306, 87 A.L.R. 285.

To repeat, when, as here, there is an evil which is reasonably apparent and when the statute has some fair relation as a remedy for the evil, the courts are powerless to interfere. It does not seem to me, in the light of what I have set out above, that we can brand the statute here as being arbitrary, unreasonable or capricious. Accordingly, I think the statute before us is constitutionally valid and that the injunction sought by the plaintiffs should be denied.