# Third District Court of Appeal

## State of Florida

Opinion filed March 11, 2015.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D13-561
Lower Tribunal No. 5-8533

_____

**Geralyn Graham,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Miguel M. De La O, Judge.

Carlos J. Martinez, Public Defender, and Robert Kalter, Assistant Public Defender, for appellant.

Pamela Jo Bondi, Attorney General, and Robert Martinez-Biswas, Assistant Attorney General, for appellee.

Before SHEPHERD, C.J., and EMAS and SCALES, JJ.

SCALES, J.

Geralyn Graham, defendant below, appeals her conviction for kidnapping and for two counts of aggravated child abuse.[1] We affirm because the jury's verdict is supported by competent substantial evidence. Specifically, the evidence supports the jury's findings that Geralyn Graham's conduct interfered with the performance of a governmental function in violation of Florida's kidnapping law and her conduct constituted aggravated child abuse.

## I. Facts

This tragic case concerns the disappearance and presumed death of four-year old Rilya Wilson in 2000. Because the Florida Department of Children and Families ("DCF") placed Rilya into court-approved protective custody from which she suffered abuse rather than enjoyed comfort and protection, this case also casts a glaring light on DCF's rights and responsibilities.

### A. Rilya's Custody

Geralyn Graham moved to Miami in 1994 with her partner, Pamela Graham ("Pamela").[2] Five years later, Geralyn Graham and Pamela met Gloria Wilson who had a three-year old daughter named Rilya. At the time, Gloria Wilson was expecting her second daughter, Rodricka.

---

[1] Geralyn Graham does not appeal her conviction for child abuse (a lesser included offense of aggravated child abuse in Count IV of the grand jury's indictment). The jury was unable to reach a verdict on Count I of the indictment, charging Geralyn Graham with first-degree murder. Therefore, that charge is not before the Court.

[2] There was no familial relationship between Geralyn Graham and Pamela Graham.

Shortly after Rodricka was born in 1999, DCF took both children into protective custody with Gloria Wilson's consent. In December 1999, DCF obtained court approval to place Rodricka and her sister Rilya in the temporary custody of non-relative adults. Rodricka was placed with Pamela, while Rilya was placed in the temporary custody of another caregiver, Pamela Kendrick.[3]

In April 2000, Geralyn Graham and Pamela took Rodricka to visit Rilya at Ms. Kendrick's home. This visit prompted Geralyn Graham to contact a supervisor at DCF to express concern about the conditions of Ms. Kendrick's house.

Soon thereafter, a DCF supervisor inspected Ms. Kendrick's home, determined that it was in Rilya's best interest to place Rilya elsewhere, and delivered Rilya to Pamela's and Geralyn Graham's home. On April 21, 2000, Pamela received a custody order for Rilya that awarded Pamela non-relative, temporary custody of Rilya. In effect, Pamela and DCF became co-custodians of Rilya and Rodricka. See §§ 39.01(59), 39.521(1)(b)3., Fla. Stat. (2000).

Pamela and Geralyn Graham agreed that, between the two of them, Geralyn Graham would care for Rilya and Rodricka during the day while Pamela worked.

---

[3] DCF undertook these various actions under the authority granted to DCF in chapter 39 of the Florida Statutes (2000). DCF's particular responsibilities toward Rilya and Rodricka derive from section 39.521 of the Florida Statutes (2000). In a larger sense, DCF assumes these responsibilities toward vulnerable children under the doctrine of *parens patriae*. See, e.g., Global Travel Mktg. v. Shea, 908 So. 2d 392, 399 (Fla. 2005). When DCF places a child under protective supervision in the home of a court-approved adult, DCF is delegating a portion of its responsibilities for the child while still retaining a parenting role that originates in *parens patriae*.

Before long, Rilya began to exhibit chronic disobedience in her new family setting. Geralyn Graham, in her capacity as Rilya's main day-time caregiver, became frustrated with Rilya and withheld affection from the child.

The evidence at trial established that Geralyn Graham further reacted to Rilya's disobedience by routinely locking Rilya in a laundry room for long periods of time. Rilya was fed in the laundry room and Rilya was allowed to leave only to use the bathroom. On one occasion, when Pamela returned home from work, Pamela observed that Rilya had suffered severe burns from the hot-water heater in the laundry room. Geralyn Graham resisted Pamela's suggestion that Rilya be taken to a doctor.

The evidence also established that Rilya regularly left her bed at night and climbed onto a kitchen counter to eat snacks and sweets. In order to prevent such behavior, Geralyn Graham placed plastic flex cuffs on Rilya's wrists in order to bind Rilya to the side of the bed. The restraining of Rilya occurred numerous times over a several month period in 2000.

Geralyn Graham believed that Rilya was out of control and defiant. For example, as Geralyn Graham would tell people, Rilya spread feces around the house and used inappropriate, mature language.

Geralyn Graham also complained that the public assistance Pamela was receiving for her custody obligations was not worth the trouble of caring for Rilya.

4

At one point, Geralyn Graham inquired as to whether the DCF would take back Rilya, but was told that DCF wanted to keep Rilya together with her younger sister.

### B. Rilya's Disappearance

One day in December of 2000, Geralyn Graham made what seemed at that moment to be an unremarkable call to Pamela at work. Geralyn Graham informed Pamela that Geralyn Graham was taking Rilya and Rodricka out for a little while. When Pamela returned home from work that night, Pamela was surprised that she was not greeted by Rilya. Pamela searched the house looking for the four-year old Rilya, but was told by Geralyn Graham that Rilya was not at home.

Geralyn Graham maintained that Rilya was okay and that Pamela should not worry, but that Pamela would not be seeing Rilya anymore. Pamela pressed Geralyn Graham for more information, but Geralyn Graham would not divulge any specifics regarding Rilya's whereabouts. When Pamela attempted to use the phone to call the police, Geralyn Graham threatened Pamela with a hammer and told Pamela to put down the phone.

Geralyn Graham told Pamela that if anyone asked Pamela the whereabouts of Rilya, Pamela should inform people that someone from DCF picked up Rilya. Indeed, during the ensuing months, Pamela told several witnesses that an agent from DCF picked up Rilya, although no one from DCF had done so.

On January 16, 2001, Pamela went to a state office to give notification that Rilya no longer lived in the home of Pamela and Geralyn Graham so that no further benefits for Rilya should be paid to Pamela. Later, in the spring of 2001, Pamela and Geralyn Graham held a garage sale where they sold Rilya's bed, dresser, and clothes.

In April 2002, Geralyn Graham received a visit at the couple's house from a DCF adoption coordinator delivering a package of materials for the potential adoptions of Rilya and Rodricka. On April 18, 2002, a DCF representative discovered for the first time that Rilya was not living with Pamela. Geralyn Graham told the representative that DCF had picked up Rilya for an evaluation and that Rilya was never returned.

DCF notified law enforcement that Rilya was missing. In interviews on April 27 and April 30, 2002, Geralyn Graham repeated to law enforcement personnel that DCF had picked up Rilya. Specifically, Geralyn Graham told law enforcement that in January 2001, DCF picked up Rilya and that, several weeks later, another DCF representative came to the house to gather Rilya's clothes and toys.

Shortly thereafter, Miami-Dade County police and crime scene technicians conducted a search of Graham's home but found no evidence of foul play. By this time, Rilya's disappearance had gained significant media attention. During a

television interview, Geralyn Graham once again stated that DCF had taken Rilya from Graham's home.

### C. *Geralyn Graham's Arrest and Incarceration*

In May 2004, Pamela decided to cooperate with law enforcement. Pamela gave a statement explaining how both she and Geralyn Graham had punished Rilya. On August 18, 2004, both Geralyn Graham and Pamela were charged with kidnapping and aggravated child abuse. On that same day, at the Women's Annex Correctional Facility of Miami-Dade County, Geralyn Graham encountered cellmate Robin Lunceford. On both that day and the next, August 19, 2004, Geralyn Graham unburdened herself to Lunceford.

According to Lunceford, Geralyn Graham revealed that Rilya was a severe disciplinary problem. Geralyn Graham described Rilya to Lunceford as a "demon" and consistently referred to Rilya as "it." Geralyn Graham told Lunceford that Rilya put her "over the edge." Ultimately, Geralyn Graham confessed to Lunceford that, despite her efforts to "change the baby," Grealyn Graham had smothered Rilya with a pillow.

During their second conversation on August 19, 2004, Lunceford asked Geralyn Graham how she had disposed of Rilya's body. Geralyn Graham told Lunceford that she had placed Rilya's body in water near her house, apparently a canal. In response to Lunceford's direct questions regarding where Rilya's body was

located, Geralyn Graham responded that she was not stupid and knew the concept of "no body, no murder." Lunceford made notes of the August 18th and August 19th conversations almost immediately after each occurred.

Geralyn Graham's cell location was changed within the Women's Annex, and in early 2005, Geralyn Graham came into contact with Maggie Carr. Carr was also an inmate, a self-described law clerk at the facility. Geralyn Graham asked Carr to explain the concept of *corpus delicti*. Geralyn Graham and Carr discussed whether Geralyn Graham could be indicted for murder if Rilya's body could not be found. "It's gone," Geralyn Graham told Carr in reference to Rilya.

### D. *Geralyn Graham's Indictment, Trial, and Verdict*

Based in part on the statements of Pamela, Lunceford and Carr, a grand jury indicted Geralyn Graham. The indictment contained five counts: first degree murder, kidnapping with the intent to interfere with any governmental or political function, and three counts of aggravated child abuse.

Geralyn Graham's criminal trial commenced in November 2012. The jury reached its verdict on January 24, 2013, finding Geralyn Graham guilty of the kidnapping charge (Count II), two counts of aggravated child abuse (Counts III and V); and the lesser included offense of child abuse (Count IV). The jury did not reach a verdict on Count I, the first-degree murder count.

Geralyn Graham challenges her conviction for kidnapping and aggravated child abuse.

**II.  Analysis**

A. *Kidnapping With Intent to Interfere With the Performance of any Governmental or Political Function*

Geralyn Graham argues that the trial court erred in denying her motion for a judgment of acquittal on the kidnapping count. When a defendant moves for a judgment of acquittal, she "admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence." Lynch v. State, 293 So. 2d 44, 45 (Fla. 1974). Our standard of review for a motion of acquittal is de novo. Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002).

Geralyn Graham was indicted for violating section 787.01(1)(a)4., Florida Statutes (2000). This statute reads, in relevant part, as follows:

> The term "kidnapping" means forcibly, secretly, or by threat confining, abducting or imprisoning another person against her or his will and without lawful authority, with intent to . . . [i]nterfere with the performance of any governmental or political function.

Geralyn Graham argues that her conviction for kidnapping requires reversal because the State failed to establish beyond a reasonable doubt either that: (i) Rilya was alive when Geralyn Graham removed Rilya from the house; or (ii) Geralyn Graham's confinement or abduction of Rilya was intended to interfere with the performance of a governmental function.

9

(i) Inconsistency of Theories of Prosecution

Geralyn Graham's first argument is that the kidnapping charge is fundamentally inconsistent with the murder charge. Graham argues that the State never established Rilya was alive when she removed Rilya from the house. Because the State's trial theory was that Geralyn Graham killed Rilya by smothering her with a pillow while at home, Graham argues the state should be precluded from maintaining the inconsistent theory – and the jury should not have rendered a verdict – that Geralyn Graham removed Rilya from the house in order to interfere with the DCF's statutory function of protecting children who are in temporary custody.

In reviewing whether the trial court erred in denying Geralyn Graham's motion for acquittal, the issue for our determination is whether the evidence adduced at trial was sufficient to support the conviction. Tibbs v. State, 397 So. 2d 1120, 1123 (Fla. 1981). In other words, we must affirm if the jury's verdict is supported by competent substantial evidence. *Id.* The jury was presented with evidence that, on the day Rilya disappeared, Geralyn Graham told Pamela in a morning phone call that Graham was taking Rilya out for a while; and, later that day, upon Pamela's return from work, Geralyn Graham told Pamela that Pamela would not see Rilya anymore, and that Rilya was okay and Pamela need not worry.

10

No doubt these statements, if factual, were contrary to the State's theory that Geralyn Graham murdered Rilya in the couple's home. Such inconsistency, however, does not invalidate a conviction based on those facts, so long as the jury's determination is supported by competent substantial evidence, the jury having resolved all conflicts in the evidence. Johnson v. State, 969 So. 2d 938, 955 (Fla. 2007) (citing Tibbs, 397 So. 2d at 1123). It is well settled that it is a jury's function to weigh contradictory evidence and to accept or reject it, in whole or in part, based on its credibility. See Fitzpatrick v. State, 900 So. 2d 495, 508 (Fla. 2005).

Geralyn Graham's statements to Pamela, if believed by the jury, provide substantial, competent evidence that Rilya was alive, and was confined or abducted by Graham without Pamela's or DCF's consent. Therefore, the evidence supports Graham's conviction on kidnapping.

(ii) Interference with Performance of Governmental Function

Geralyn Graham's second argument is that the kidnapping statute under which she was charged does not apply to this situation. Graham argues that her alleged removal of Rilya from the home did not "interfere with the performance of any governmental or political function." § 787.01(1)(a)4., Fla. Stat. (2000).

Geralyn Graham (and the dissent) cites to a comment to the Model Penal Code's version of the crime of kidnapping with intent to interfere with the

11

performance of a governmental function, and asserts that the Model Penal Code provision does not contemplate the type of kidnapping alleged in the instant case.[4]

Essentially, Geralyn Graham urges us to read into the statute certain examples of governmental functions found in the comment to the Model Penal Code. Geralyn Graham's argument suggests that only those specified examples (i.e., abductions of witnesses, candidates, party leaders, officials and voters) found in the comment can constitute the type of abductions that are subject to the statute's protections.

We review collateral information, such as a comment to a model code, for legislative intent *only* when the statute being construed is ambiguous. Holly v. Auld, 450 So. 2d 217, 219 (Fla. 1984) (quoting A.R. Douglass, Inc. v. McRainey, 137 So. 157 (Fla. 1931)). The subject kidnapping statute is written in plain and unambiguous terms. The significant language of section 787.01(1)(a)4. – "interfere with the performance of any governmental . . . function" – is susceptible of plain meaning. Reference to collateral information is therefore unnecessary.

As charged in the indictment, the governmental function was DCF's "protective supervision" of Rilya in the home of an adult approved by the court. §

_____

[4] See ALI, Model Penal Code § 212.1, comment 3 to Tentative Draft No. 11 at 18 (1960). The comment refers to the abduction of witnesses, candidates, party leaders, officials, and voters. Florida's kidnapping statute, first adopted in 1974, is patterned after this Model Penal Code provision, but does not include or incorporate the examples mentioned in the comment.

12

39.521(1)(b)3., Fla. Stat. (2000). Protective supervision is a legal status in dependency cases that provides a vulnerable child a safe home, subject to court review. § 39.01(59), Fla. Stat. (2000). In the performance of its express governmental function of supervising and, in effect, parenting vulnerable children, DCF is entitled to the corresponding protections afforded by Florida's kidnapping law.

At trial, the jury was presented with evidence that: (1) on April 21, 2001, Pamela was granted temporary custody of Rilya; (2) Pamela's custody of Rilya was shared with DCF, a duly authorized agency of state government[5]; (3) DCF had the statutory function[6] to care for and to protect the safety and welfare of Rilya; and (4) Geralyn Graham repeatedly misrepresented to DCF and law enforcement officials that DCF had removed Rilya from the couple's home.

When reviewing a trial court's denial of a motion for judgment of acquittal, our role as an appellate court is not to reweigh the evidence; our function is to determine whether the evidence supported the jury's guilty verdict. Tibbs, 397 So. 2d at 1123. The jury determined that Geralyn Graham's conduct was intended to, and did, interfere with DCF's express governmental function of protecting

---

[5] DCF's former director of operations in South Florida testified at trial that DCF maintains custody of a dependent child along with the temporary custodian.

[6] See §§ 20.19(1)(a), 39.001(1)(b)(1), 39.4085, and 39.521(1)(b)3., Fla. Stat. (2000).

children, like Rilya, who are under temporary protective supervision. The jury's verdict is supported by the evidence.[7]

B. *Aggravated Child Abuse*

Geralyn Graham was also convicted of two counts of aggravated child abuse. Specifically, the jury found that Geralyn Graham's binding Rilya to the bed at night (as alleged in Count III) and her punishing Rilya by locking her in a laundry room for extended periods of time (as alleged in Count V) constituted aggravated child abuse.

Geralyn Graham argues that the trial court erred in denying her motion for judgment of acquittal as to these two counts.

---

[7] We are mindful of the dissent's concern (expressed in its footnote 9) that our opinion could result in prosecution for kidnapping whenever a person interferes with a state agency's custody of a child or removes a child from the state contrary to an order of a state agency or court. The kidnapping statute under which Geralyn Graham was charged, section 787.01(1)(a)4., more appropriately encompasses the totality and gravity of Geralyn Graham's felonious conduct than the crimes defined in sections 787.02 (false imprisonment), 787.03 (interference with custody), and 787.04 (removal of child from state). A false imprisonment under section 787.02 does not necessarily interfere with the performance of a governmental function. Interference with custody (section 787.03) or removal from the state (section 787.04) are not necessarily forcible, secret, by threat, or against the will of the child. Geralyn Graham's violent acts toward Rilya, combined with her deliberate, orchestrated effort to mislead DCF officials and interfere with DCF's duties, implicated section 787.01 foremost. The circumstances of this case are extraordinary. Our opinion should not be construed to expand the meaning of "kidnapping" or to dislocate the coordinated parts of chapter 787.

Pertinent to these two counts, the jury was instructed that aggravated child abuse occurs when a person "maliciously punishes" a child. See § 827.03(2)(b), Fla. Stat. (2000). Consistent with State v. Gaylord, 356 So. 2d 313, 314 (Fla. 1978), the trial judge instructed the jury that "maliciously" means done from "ill will, hatred, spite or an evil intent."[8]  Geralyn Graham argues that, while her actions might have shown bad judgment, the State offered no evidence that Geralyn Graham's actions were motivated by ill will, spite or hatred.

We disagree.

The jury was presented with ample evidence from which it could conclude that Geralyn Graham's actions in locking Rilya in a laundry room and binding Rilya to the bed with plastic cuffs were motivated by Graham's resentment toward and

---

[8] Geralyn Graham also challenges the trial court's failure to give a jury instruction defining "maliciously" consistent with the 2003 Legislature's amendment of the statute. In 2003, more than two years after the crime occurred, the Legislature amended the relevant statute by adding a new subsection which read:

> For the purposes of this section, "maliciously" means wrongfully, intentionally, and without legal justification or excuse. Maliciousness may be established by circumstances from which one could conclude that a reasonable parent would not have engaged in the damaging acts toward the child for any valid reason and that the primary purpose of the acts was to cause the victim unjustifiable pain or injury.

§ 827.03(4), Fla. Stat. (2003).

We conclude the trial court did not err by instructing the jury on the law in effect at the time of the commission of the crime. Rock v. State, 800 So. 2d 298, 299 (Fla. 3d DCA 2001).

15

hatred for Rilya. For example, Robin Lunceford testified that Geralyn Graham considered Rilya a "demon," referred to Rilya as "it," and that Rilya put Geralyn Graham "over the edge." The jury heard evidence that Geralyn Graham tried to return Rilya to DCF because, to Graham, the aggravation caused by Rilya was not worth the benefits Pamela received from DCF.

The jury's verdict that Rilya was the victim of aggravated child abuse administered by Geralyn Graham is supported by the evidence.

## III. <u>Conclusion</u>

Because we conclude that the jury's verdict was supported by the evidence adduced at trial, we affirm Geralyn Graham's conviction.

Affirmed.

SHEPHERD, C.J., concurs.

16

EMAS, J., concurring in part and dissenting in part.

I concur with that portion of the majority's opinion which affirms the convictions and sentences for two counts of aggravated child abuse. However, I respectfully dissent from that portion of the majority opinion which affirms the conviction and sentence for kidnapping.

Count II of the Indictment charged Geralyn Graham with kidnapping. In relevant part, this count charged that Geralyn Graham,

> between December 1, 2000, and December 31, 2000. . . without lawful authority did then and there forcibly, secretly, or by threat, confine, abduct or imprison another person, to wit: RILYA WILSON, a 4-year-old female child. . ., and said confinement was without the consent of said victim's legal custodians, Pamela Graham, the temporary legal custodian, and the Florida Department of Children and Families, the legal custodian, <u>with the intent to interfere with the performance of any governmental function, to wit: The care, custody and responsibility for the welfare, safety and whereabouts of RILYA WILSON by the Department of Children and Families, a duly authorized agency of the State of Florida,</u> in violation of s. 787.01(1) & (2), Florida Statutes. . . .

(Emphasis added.)

Kidnapping is a first-degree felony punishable by life imprisonment, and is defined as follows:

> (1) "Kidnapping" means forcibly, secretly, or by threat confining, abducting or imprisoning another person against his will and without lawful authority with intent to:

> (a) Hold for ransom or reward, or as a shield or hostage; or

17

(b) Commit or facilitate commission of any felony; or

(c) Inflict bodily harm upon or to terrorize the victim or other person; or

(d) Interfere with the performance of any governmental or political function.

(2) Confinement of a child under the age of thirteen (13) is against his will within the meaning of subsection (1) if such confinement is without the consent of his parent or legal guardian.

(3) Whoever kidnaps a person is guilty of a felony of the first degree, punishable by imprisonment for a term of years not exceeding life or as provided in chapter 775.

§ 787.01, Fla. Stat. (2000) (emphasis supplied).

The State did not charge Graham with kidnapping with the intent to hold the victim for ransom or as a hostage, to facilitate the commission of any other felony, or to inflict bodily harm upon or terrorize the victim. Rather, the State alleged that, by removing the child from the custody of the Department of Children and Families, Graham acted with the intent to "interfere with the performance of any governmental or political function." I conclude that the relevant statutory language of section 787.01(1)(d) ("with intent to . . . [i]nterfere with the performance of any governmental or political function") is ambiguous and, in light of the overall statutory scheme of Chapter 787, Florida Statutes[9]; the history and source of the

_____

[9] See and compare § 787.01, Fla. Stat. (Kidnapping) (a first-degree felony punishable by life imprisonment, and requires proof of at least one of the four aggravating circumstances of intent or purpose); § 787.02 (False Imprisonment) (a third-degree felony, proscribing the same conduct as kidnapping but without any of

18

legislation[10]; the intent and meaning of this language as expressed by the

originating source upon which this legislation was based[11]; canons of statutory

---

the four aggravating circumstances of intent or purpose); § 787.03 (Interference with Custody, a first-degree misdemeanor); and § 787.04 (Removal of Child from State Contrary to Court Order, a third-degree felony). Given the majority's holding, any person who interferes with custody or removes a child from the state contrary to court order (a first-degree misdemeanor and third-degree felony, respectively) would necessarily satisfy the "interfere with governmental or political function" element of kidnapping, thereby subjecting them to prosecution for a crime punishable by life imprisonment.

[10] The relevant version of Florida's kidnapping statute was first adopted in 1974, see Ch. 74-283, Laws of Florida (1974) and is patterned after the American Law Institute's (ALI) Model Penal Code provision, first published in 1960, which provided in pertinent part:

**American Law Institute Model Penal Code**
**§ 212.1. Kidnapping**

A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following purposes:
(a) to hold for ransom or reward, or as a shield or hostage; or
(b) to facilitate commission of any felony or flight thereafter; or
(c) to inflict bodily injury on or to terrorize the victim or another; or
(d) to interfere with the performance of any governmental or political function.

[11] When the American Law Institute proposed and published the Model Penal Code provisions, it was accompanied by comments to assist and guide state legislatures that were considering the adoption of one or more of the provisions of the Code. With regard to the kidnapping statute, the comments to the Model Penal Code provided:

Clause (d) ["to interfere with the performance of any governmental or political function"] raises to the aggravated felony level certain interference with political and governmental functions which might otherwise be misdemeanors or felonies of the third degree, e.g.,

19

construction[12]; and case law from other jurisdictions construing the very same statutory language found in Florida's kidnapping statute[13], I would hold that the

abduction of witnesses, candidates, party leaders, officials [and] voters.

ALI, Model Penal Code, § 212.1, comment 3 to Tentative Draft No. 11 at 18 (1960) (emphasis supplied). See also ALI, Model Penal Code, § 212.1, comment 4 at 228 (1980) (noting that clause (d) was intended to "reach[] political terrorism and the like, and classifies such conduct as among the most serious kinds of unlawful confinement").

[12] Florida Courts have often looked to the Model Penal Code and Comments as a guide for statutory construction of legislation adopted from and patterned after the Code. See e.g., State v. Ecker, 311 So. 2d 104 (Fla. 1975); Carroll v. State, 680 So. 2d 1065, 1067 n. 3 (Fla. 3d DCA 1996) (referring to Model Code, on which Florida statute was based, in construing criminal attempt statute and renunciation defense); Bright v. State, 555 So. 2d 1284 (Fla. 3d DCA 1990) (same, construing self-defense statute); D.A. v. State, 471 So. 2d 147 (Fla. 3d DCA 1985) (same, construing loitering and prowling). See also, Carolene Products Co. v. United States, 323 U.S. 18, 25-27 (1944) (acknowledging, as a presumption of legislative intent, the "general rule that adoption of the wording of a statute from another legislative jurisdiction, carries with it that jurisdiction's previous judicial interpretations of the wording"); State v. Aiuppa, 298 So. 2d 391, 394 (Fla. 1974) (same); Flammer v. Patton, 245 So. 2d 854, 858 (Fla. 1971) (same); Dunn v. Doskocz, 590 So. 2d 521, 523 (Fla. 3d DCA 1991) (noting that "where a Florida statute is patterned after a statute of another state, we may look to the judicial interpretation of the other state as persuasive authority in interpreting the Florida statute.")

[13] See e.g., Flores v. State, 186 S.W. 3d 398 (Mo. App. 2006) (holding that mother's removal of her children from the court-ordered custody of the State and taking them to Arizona did not constitute kidnapping, as this conduct did not "interfere with the performance of a governmental or political function"); Spier v. State, 174 S.W. 3d 539 (Mo. App. 2005) (same, and acknowledging that this statute, patterned after the Model Penal Code, was intended for situations of political terrorism, such as the abduction of witnesses, candidates, party leaders, officials, and voters); Commonwealth. v. Barfield, 768 A.2d 343 (Pa. 2001) (affirming appeals court determination that non-custodial parent's removal of children from court-ordered placement in foster care did not support kidnapping

20

legislative intent was to proscribe and punish the conduct in this case as false imprisonment rather than kidnapping. As a result, the kidnapping judgment and sentence should be reversed and remanded for the purpose of correcting the judgment to the necessarily lesser-included offense of false imprisonment[14] and for resentencing on that conviction.

I therefore concur in part and dissent in part.

---

charge, as such conduct did not "interfere with the performance of any governmental or political function", the intent of which was to reach political terrorism and the like).

[14] See Fla. R. Crim. P. 3.620; State v. Sigler, 967 So. 2d 835 (Fla. 2007) (construing parallel statutory provision, section 924.34, Florida Statutes, to permit appellate court to direct trial court to enter judgment for a lesser offense when all elements of the lesser offense have been determined by the jury). Appellant conceded, in oral argument, that the evidence presented at trial was sufficient to sustain a conviction for false imprisonment.